## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SHANNON RUSSELL AGUIRRE, | ) | |
| EDWARD BLOTNICKI III, | ) | |
| SANDRA BURNS, JOHN BRILEY, | ) | |
| BENJAMIN CARTER, TINA CASH, | ) | |
| DANIEL DURGIN, STEFANIE EMERICK, | ) | Case No.  1:19-cv-09577 |
| TAWANA HUSTON, ERIC FISHON, | ) | |
| ERICA PARKS, SARAH PATELLOS, | ) | |
| ROMONA REED, | ) | **THIRD AMENDED** |
| CHRIS SMITH, KRISTIN STELEA, | ) | **CLASS ACTION COMPLAINT** |
| PEGGY TATUM, TIMOTHY THOMAS, | ) | |
| CHRISTINA VAIN, and TIA WINSTON, | ) | |
| on behalf of themselves and others | ) | |
| similarly situated, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| HELLO PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiffs Shannon Russell Aguirre, Edward Blotnicki III, Sandra Burns, John Briley, Benjamin Carter, Tina Cash, Daniel Durgin, Stefanie Emerick, Eric Fishon, Tawana Huston, Erica Parks, Sarah Patellos, Romona Reed, Chris Smith, Kristin Stelea, Peggy Tatum, Timothy Thomas, Christina Vain, and Tia Winston ("Plaintiffs") bring this Class Action against Hello Products, LLC ("Defendant" or "Hello" herein), on behalf of themselves and all others similarly situated, and allege the following based on their personal knowledge and the investigation of their counsel:

## I.    INTRODUCTION

1.        This is a consumer Class Action against Defendant, an oral care company, for its false advertising, unfair and deceptive marketing practices, and materially misleading claims and

omissions it negligently employed and disseminated in connection with the sale of its line of dental products containing activated charcoal.

2.      Activated charcoal is highly porous and has adsorptive qualities that can be useful in certain contexts. In recent years, health and beauty products containing activated charcoal have become a consumer sensation. Opportunistic marketers, celebrities and social media influencers tout a variety of activated charcoal products for purported detoxifying properties and other enhanced wellbeing and health benefits. Consumers have been willing to pay a premium for these charcoal products based on these purported benefits.

3.      Hello sells oral care products containing activated charcoal, including the following products: (1) activated charcoal fluoride free toothpaste; (2) activated charcoal epic whitening fluoride toothpaste; (3) cbd fluoride free toothpaste + activated charcoal; (4) activated charcoal + hemp seed oil toothpaste; (5) activated charcoal + matcha green tea toothpaste (6) activated charcoal + natural dragon fruit toothpaste; (7) activated charcoal + natural açai toothpaste; and (8) other charcoal oral care products.."[1] Hereinafter, these products as well as any other Hello products containing activated charcoal that have been available for purchase within the relevant statute(s) of limitations, will be referred to collectively herein as the "**Charcoal Products**" and the toothpastes specifically will be referred to as the "**Charcoal Toothpastes**." Additionally, at times when relevant to the allegations herein, Charcoal Toothpastes containing fluoride are referred to as the "**Fluoride Charcoal Toothpastes**" and those that are fluoride-free are referred to as the

---

[1]      In its marketing materials and on its product packaging and labeling, Defendant typically uses lower case font, rather than capitalized letters. It uses lower case in its presentment of its brand name ("hello products" or "hello"), as well as in the printed or online text with which it conveys product and brand information, including descriptors, ingredients lists, claimed benefits and properties of the product, directions for use, and other claims and representations. For purposes of this Complaint, capitalization is used when referring to Hello in its capacity as the Defendant. Otherwise, the Complaint will replicate the same use of lower case lettering used by Hello in its product names, descriptors and other written representations on its product packaging and in print and online marketing materials.

"**Fluoride-Free Charcoal Toothpastes**." Both subsets are otherwise subsumed in the term Charcoal Toothpastes.

4.      Hello promotes the Charcoal Toothpastes as whitening, cleansing, polishing, breath-freshening, stain-lifting, plaque-removing, detoxifying, adsorptive, and generally safe, effective and beneficial for daily, long-term oral care use. Multiple claims are printed on the product packaging and tube labels of the Charcoal Toothpastes, including: "whitens naturally," "noticeably whiter teeth" and "epic whitening." The packaging and tubes also claim that activated charcoal "is a detoxifier that removes surface stains and freshens breath." The ingredients list states: "charcoal powder (whitens, polishes and cleans teeth/freshens breath)." The Fluoride Charcoal Toothpastes additionally state: "safe for enamel." In its extensive online marketing and print advertising, Hello makes the same and similar claims of "epic" and natural whitening effects, detoxifying and adsorptive properties, gentleness and safety for long-term daily use, and other benefits of its Charcoal Toothpastes. Hello often employs the marketing slogan: "it's simple, black paste equals white teeth."

5.      Hello's marketing strategy has been very successful, and the Charcoal Toothpastes have become one of the top sellers in its product category. It reports that its toothpaste, "hello activated charcoal fluoride-free whitening toothpaste" is the "#1 selling charcoal toothpaste in FDM (source: IRI MULO L52 weeks 3.24.19)."[2] However, that success is built around messaging that is materially misleading and deceptive to consumers, lacks a factual basis, and negligently and recklessly omits material information concerning the use of charcoal in oral care.

6.      Hello promotes itself as a "naturally friendly" brand to be trusted and relied upon by consumers in connection with their decision-making as to oral health and dental hygiene.

---

[2]      Reported at the bottom of all hello-products.com pages, https://www.hello-products.com/ (last accessed September 17, 2019).

Through its marketing campaign, which is ubiquitous and high in volume and content, Hello conveys a clear message that the brand is extremely conscientious and focused on health and safety. Hello specifically holds itself out as possessive of expertise and specialized knowledge on oral healthcare, and qualified to promote its "thoughtfully formulated" Charcoal Toothpastes. Hello has consistently employed this messaging for several years, and through it has sought to instill consumer confidence. It has done so knowing consumers' belief in its purported specialized knowledge and trustworthiness would induce consumers to rely on its specific claims concerning its products. Hello was and remains uniquely situated to evaluate the veracity of its claims on its own products, and consumers were justified to rely on the brand and the ubiquitous claims of safety, gentleness, 'natural' whitening, detoxifying and other properties of the Charcoal Toothpastes. And consumers (including the named Plaintiffs) did in fact so rely, when they made their decision to purchase the Charcoal Products and use them for dental hygiene and oral health maintenance. As such, a "special relationship" that imposes a duty on Hello to impart correct information to Plaintiffs and other consumers was in existence at all relevant times.

7.    Indeed, Hello was well aware that it had duties to uphold as to its marketing, advertising and labeling of the Charcoal Products. This is in part evidenced by the fact that the oral care products it develops, markets, and sells are all subject to a legal and regulatory framework over cosmetics and over-the-counter drugs.[3] For example, the Federal Trade Commission ("FTC") requires that marketers such as Hello ensure that advertising claims are truthful, not misleading, and supported by a reasonable basis and to do so before disseminating such claims. The Federal Food and Drug Administration ("FDA") prohibits the misbranding of products such as the Charcoal Toothpastes, and are deemed misbranded if false or misleading in any particular. They

---

[3]    Each of the Charcoal Toothpastes qualify as a cosmetic or a combination of cosmetic and over-the-counter drug, under the pertinent legal framework, as explained *infra*.

can also be deemed misbranded if certain claims conveyed lack the requisite competent and reliable scientific evidence to substantiate them. Federal law and agency regulations, as well as certain state consumer protection laws that mirror the same, clearly provide for a standard of care and various obligations as to transparency, truthfulness, disclosures and substantiation of the health, safety and efficacy claims for products that qualify as cosmetics, over-the-counter drugs, or a combination of the two.

8.      The consensus of respected dentists, researchers and industry experts weighs *against* the use of charcoal dentifrices,[4] due to the lack of scientific substantiation on safety and efficacy, as well as risks of harm. For example, in 2017, findings published in the Journal of the American Dental Association (JADA) concluded that there is insufficient laboratory or clinical data to substantiate the safety and efficacy of dentifrice containing activated charcoal, and cautioned against its use. In 2019 the British Dental Journal (BDJ) again confirmed a lack of substantiation in the form of scientific, sound and reliable studies. The 2019 BDJ article expressed concern that charcoal toothpastes are a "marketing gimmick" that could, in fact, cause harm to oral health, structures, and aesthetics. Many qualified dental professionals have also spoken out on these findings and other safety, therapeutic and cosmetic concerns, and have cautioned against the use of charcoal dentifrices. Dr. Ada Cooper, a spokesperson for the American Dental Association, recently commented on the lack of safety substantiation (and reported hazards) for charcoal dentifrice and stated: "Just because something is popular doesn't mean it's safe."[5]

---

[4]      "Dentifrice" is a term for tooth-cleansing pastes and powders.
[5]      "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/]. (emphasis added).

9.      Notably, the American Dental Association ("ADA") has not approved *any* charcoal dentifrices for its ADA Seal of Acceptance (the "ADA Seal"). The ADA Seal certifies the safety and efficacy of a dentifrice, based on clinical data and research.

10.      Hello knew or should have known that many of its claims regarding the Charcoal Toothpastes were misleading, deceptive, and/or false and lacked a reasonable basis or credible substantiation. For example, the promise that the Charcoal Toothpastes functioned as an oral detoxifier that can remove surface stains through adsorption is pseudo-scientific, and essentially an impossibility. And, despite its affirmative and persistent messaging around the thoughtful formulation of its 'naturally friendly' products, as well as its legal obligations to have a basis for its claims, Hello did not possess the requisite evidence to substantiate its claims concerning the cosmetic and health benefits or the safety of its Charcoal Toothpastes; such evidence did not exist at the times it made its claims, nor does it currently exist. Hello actively mislead consumers to believe the product was safer and gentler than other whitening toothpastes, and superior to other similar products sold by competitors, and also that Hello had the credibility and science to back up all of its claims (for example, on the Hello website it states "a resounding YES" in response to whether the products are safe). Hello induced consumers' trust and reliance, and encouraged consumers to engage with its website and hashtags and presents numerous claims on the safety, function, and attributes of charcoal for use in oral care, much of which are accredited to a research scientist who "thoughtfully formulated" the products themselves.

11.      Hello also omitted material facts, including that charcoal, when used in dentifrice is known to be abrasive to enamel and the gums, and to pose risky safety hazards with use. And, it may in fact be detrimental and harmful to oral health and aesthetics. It failed to disclose that

scientific literature contra-indicates the safety and efficacy of charcoal in oral care use. It failed to disclose its lack of safety substantiation, despite a duty to do so.

12.     Such representations and omissions were and are materially misleading, in that they are likely to deceive a reasonable consumer and also directly concern unique and intrinsic qualities of the products, and caused an increase in consumers' perception of their value. Consumers (including the named Plaintiffs) would not have paid premium prices or even purchased them at all, but-for the representations on the attributes of activated charcoal and the benefits its products could naturally and safely deliver. Moreover, had Hello revealed that charcoal in dentifrice is highly abrasive, carries significant risks, and/or even that Hello lacked the substantiation it was legally required to possess for its claims, then reasonable consumers, who had been drawn in by Hello's friendly marketing tactics, would have had cause to refrain from purchasing, as well as using the Charcoal Toothpastes.

13.     Hello nonetheless aggressively proceeded with its opportunistic marketing campaign, claiming to be conscientious, trustworthy and possessive of special expertise on its Charcoal Toothpastes in order to secure consumer confidence, while negligently and recklessly making false, misleading, unsubstantiated, or impossible claims on its benefits and properties. To the current day, Hello continues its negligent and false advertisement campaign to induce consumer reliance and purchase, without regard to the consequences to the deceived consumer.

14.     Hello's messaging and marketing claims are substantial in volume and content and are ubiquitously made both online and are printed on the product packaging and labeling of the Charcoal Toothpastes, such that the Plaintiffs and other consumers are exposed to a coherent advertising scheme and claims that are uniformly the same and/or substantially similar.

15. Hello charges a $1 to $2 price premium for the Charcoal Toothpastes over Hello's other toothpastes that do not contain charcoal.

16. As a result of Hello's marketing claims and messaging Plaintiffs and other consumers reasonably and justifiably relied upon and attributed credence and value to the asserted benefits, efficacy, and safety of the Charcoal Toothpastes. They did not know, nor could have known, of Hello's omissions of material information and misrepresentations deceptive and false marketing practices, or of the lack of required substantiation on safety and efficacy.

17. As a direct and proximate result of Hello's misrepresentations, material omissions and deceptive practices in its advertising and labeling, Plaintiffs and others similarly situated have suffered actual injuries from their purchase of one or more of the Charcoal Toothpastes, and did not receive the full value of their purchase.[6] Hello successfully induced Plaintiffs and the putative class members to purchase the Charcoal Toothpastes that (i) cannot and do not perform by 'naturally' whitening, detoxifying, adsorbing, and other promises; (ii) are not safe and gentle as represented; (iii) do not meet basic oral hygiene needs that other, less expensive dentifrices would; and (iv) may in fact be detrimental and harmful to oral health and aesthetics. Furthermore, some consumers have experienced the extreme negative effects that activated charcoal can cause,

---

[6] All that Plaintiffs must allege that "on account of a materially misleading practice, [they] purchased a product and did not receive the full value of [their] purchase." *See Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016) (*quoting Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)). "Defendant argues that New York courts have recognized the payment of a plaintiff's purchase price as a Section 349 injury only when the plaintiff paid a "price premium." But there is no such rigid "price premium" doctrine under New York law." *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015).

In some consumable products cases, the issue of a specific "price premium" will be relevant because it shows that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers. *See Koenig v. Boulder Brands, Inc.*, 995 F.Supp.2d 274, 288–89 (S.D.N.Y.2014) (finding a sufficiently-pled § 349 injury where plaintiff alleged that he would not have paid the price charged for "fat-free" milk had he known it contained fat); *Lazaroff v. Paraco Gas Corp.*, 967 N.Y.S.2d 867, 2011 WL 9962089 (N.Y.Sup.Ct. Kings Cty., Feb. 25, 2011) (finding a sufficiently-pled § 349 injury where plaintiff alleged that he would not have paid the price charged for a "20 pound" propane cylinder had he known it contained only 15 pounds of propane).

including discoloration of the gumline, gum irritation, excessive abrasion of tooth enamel and dentin, yellowing of the teeth, and damage to dental implants.[7]

18.   By falsely advertising and misbranding its Charcoal Toothpastes, Hello prioritizes its own profits and jeopardizes consumers' dental hygiene, oral health and safety. Hello's conduct in its advertising, labeling, and sale of the Charcoal Toothpastes was, and continues to, be substantially injurious to consumers, as well as unconscionable and in contravention of public policy.

19.   Hello's false advertising and labeling and materially misleading claims and omissions have enabled it to sell the Charcoal Toothpastes in great quantity. In 2018, Hello's CEO Craig Dubitsky estimated that Hello's revenue would exceed $20 million.[8]

20.   Defendant's conduct is consumer-oriented and likely to deceive reasonable consumers, and is in violation of New York consumer laws and constitutes unlawful practices in violation of Sections 349 and 350 of New York General Business Law and is also in violation of the consumer protection laws of various other states, as alleged in greater detail herein. Defendant's conduct also constitutes a breach of the UCC express and implied warranties, as well as violations of common law. Defendant was unjustly enriched as result of its misconduct.

21.   Plaintiffs bring this proposed Class Action on behalf of themselves and other similarly situated consumers who purchased Hello's Charcoal Products within the relevant statute(s) of limitations (the "Nationwide Class"), as well as proposed subclasses of members who purchased Hello's Charcoal Products in various states (defined below). Together, the Nationwide

---

[7]   And, for the rest, on top of their out-of-pocket economic injury many are left other murkier consequences such as depleted oral health or a continued inability to know for sure if the use of the Charcoal Toothpastes damaged their enamel or gums or was otherwise detrimental to their oral health.

[8]   Amy Feldman, "Taking on the Toothpaste Giants: How One Entrepreneur Built a Fresh $20 Million Brand," Forbes, Mar. 29, 2018, [https://www.forbes.com/sites/amyfeldman/2018/03/29/taking-on-the-toothpaste-giants-how-one-entrepreneur-built-a-fresh-20-million-brand/#4ba7c73c4019] (last accessed June 20, 2019).

Class and subclasses are collectively referred to herein as the "Class".. For the alleged violations of state statutory law and common law, Plaintiffs seek, on behalf of themselves and the members of the Class, to recover compensatory and statutory damages, treble or punitive damages as available, attorneys' fees and costs, as well as declaratory and injunctive relief.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and each of the Plaintiffs, with the exception of Plaintiff Vain, is a citizen of a state different from the Defendant.

23.     This Court has personal jurisdiction over Defendant,[9] because Defendant has sufficient minimum contacts with the state of New York and purposefully availed itself, and continues to avail itself, of the jurisdiction of this New York through the privilege of conducting its business ventures in the state of New York, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Specifically, it promotes its products (including the Charcoal Toothpastes) in this state through print and online advertising and marketing disseminated in New York (and targeted at New York residents), and also distributes and sells its products (including the Charcoal Toothpastes) in the state of New York. Much of the conduct giving rise to this action occurred in the state of New York because many of the acts, claims and omissions giving rise to this action occurred in and were disseminated in the state of New York; several of the named Plaintiffs made their purchases in the state of New York and the purchased products were delivered to and/or used in New York; because Hello

---

[9]     At all relevant times hereto, Defendant was a non-domiciliary entity that was duly authorized to conduct business in the state of New York. Defendant has committed tortious acts causing injury to consumers within the state of New York, which Defendant should reasonably have foreseen.

entered into and serviced numerous sales transactions for the Charcoal Products in the state; and numerous other putative class members also purchased the Charcoal Products in New York, and did so in reliance on, and as an immediate result of, the claims and omissions by Hello in its labeling, marketing, and advertising scheme. Hello's activity within the state is substantial and is not isolated.

24.     Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, as Defendant does business throughout this district (including promoting, selling, marketing, and distributing the Charcoal Products at issue), and several of the named Plaintiffs made their purchase of the Charcoal Toothpaste in this district and their purchased product was delivered to, and used, in this district.

### III.   PARTIES

25.     Plaintiff Timothy Thomas ("Plaintiff Thomas" or "Mr. Thomas") resides in Chandler, Arizona. Plaintiff Thomas purchased a Charcoal Toothpaste at Walmart in December 2018 and February 2019. Mr. Thomas was influenced by and specifically relied upon claims that that the product was natural and that it would safely, gently and effectively whiten and brighten teeth through the special properties of charcoal, and detoxify and freshen breath. He believed it was a healthier, safer, less abrasive, and natural alternative to other tooth whitening products. Hello's product packaging and marketing led him to believe that the product had been tested and proven to be safe. It also led him to believe it would be highly effective because of its touting of the miraculous attributes of charcoal, including claims of "epic whitening" and "works brilliantly." However, his expectations were not met. The product did not achieve the desired results of

whitening his teeth or noticeable breath freshening. It was also messy, and added a chore of cleaning up all the black paste, but with no added benefit.

26.     Plaintiff Tina Cash ("Plaintiff Cash" or "Ms. Cash") resides in West Memphis, Arizona. Plaintiff Cash purchased a Charcoal Toothpaste on several occasions, including in May and June of 2019. Plaintiff Cash was influenced by and specifically relied upon claims that the product would naturally whiten teeth, freshen breath, and remove plaque. The product was touted to "work brilliantly," so the branding made her believe the product would really work. The black color of the toothpaste brought it a unique appeal because it seemed different and likely to be effective if it had such a high concentration of the charcoal ingredient touted with so many benefits. She expected the product to promote good oral health, to safely whiten teeth, and to remove plaque. Plaintiff Cash purchased the product numerous times, but after a prolonged period of use, she found the product did not meet her expectations. Ms. Cash stopped using the product when she noticed particles lingering in her mouth (in between her teeth and along the gumline). She remains concerned because she can still feel charcoal particles that remain in her teeth and gums.

27.     Plaintiff Peggy Tatum ("Plaintiff Tatum" or "Ms. Tatum") resides in Brentwood, California. Plaintiff Tatum purchased a Charcoal Toothpaste on June 14, 2019 at Target. She expected that use of the product would result in healthier, more beautiful white teeth. However, her expectations were not met.

28.     Plaintiff Kristin Stelea ("Plaintiff Stelea" or "Ms. Stelea") is an American citizen who resides in London, England, and resided in the State of California at the time she purchased the Hello Activated Charcoal Whitening Toothpaste (the "product" for purposes of this paragraph). She purchased the product in a store in California. The product appealed to her because it advertised that it was "clean," "paraben-free" "sulfate-free" and "dye-free". She was also induced

to buy the product because the advertising said it would whiten her teeth. She believed that because of the advertising, the product would be a safe and clean product. However, Ms. Stelea's expectations were not met, and she disposed of the product because of its taste, residue, and gritty texture.

29.     Plaintiff Benjamin Carter ("Plaintiff Carter" or "Mr. Carter") resides in Denver, Colorado. Plaintiff Carter purchased a Fluoride-Free Charcoal Toothpaste from Grove Collaborative (an online site purveying "eco friendly" and "natural" household and personal care products at www.grove.co). He purchased the Charcoal Toothpaste as part of a trio offered on the Grove online store, which also came with a Hello brand charcoal mouthwash and a Hello brand charcoal toothbrush.[10] Mr. Carter was influenced by and relied upon the claim that the product would naturally and safety whiten his teeth, and do so without the use chemicals or other damaging, dangerous or poisonous ingredients. Mr. Carter held an affirmative expectation that the Fluoride-Free Charcoal Toothpaste would not cause damage. This was important to Mr. Carter because he knew he needed to protect his teeth from damage. He had opted against a fluoride product because he was concerned about the risks of fluoride use. As such, while he did not expect the product would strengthen his teeth (because it did not contain fluoride and did not claim to strengthen teeth), Mr. Carter nonetheless recalls explicitly expecting that product use would not weaken or damage his teeth. He was impressed that the brand appeared to make a significant effort to be less impactful on the environment, and also to provide effective and safe products without the use of unsafe ingredients. Hello's marketing created an impression in him that the brand was clean, friendly, and simple – just as he hoped his teeth would be. Mr. Carter expected the product to clean

---

[10] Hello offers the same oral care trio, or "hello activated charcoal bundle," on its website and promotes it as "a regimen that's pretty coal." It contains the "hello activated charcoal epic whitening fluoride-free toothpaste with fresh mint + coconut oil" and "hello activated charcoal extra freshening mouthwash, natural fresh mint with coconut oil" and a "hello activated charcoal bamboo toothbrush."

his teeth effectively (and thereby help to prevent cavities and other problems). He also expected that the promised whitening effects would be achieved rather quickly, especially since he used it in conjunction with the other two Hello charcoal products within the oral care trio (the mouthwash and toothbrush are both also touted as whitening). After a period of use, however, Mr. Carter did not experience any cosmetic benefits or oral health improvements. There was no noticeable difference in the coloration of his teeth, and he also became increasingly concerned about his tooth enamel and overall oral health. His dentist urged him to use fluoride products.

30.    Plaintiff Erica Parks ("Plaintiff Parks" or "Ms. Parks") resides in Orlando, Florida. Plaintiff Parks purchased a Fluoride-Free Charcoal Toothpaste at a Publix store. She was influenced by the product packaging as well as the advertising online on Hello's website. She specifically relied upon Hello's claim of "epic whitening," and she expected it to perform as stated. She also relied on and expected the product to perform in its claim to freshen breath. The dark black color of the toothpaste left an impression on Ms. Parks, because she believed it meant it contained more charcoal in it than other charcoal toothpastes she previously used (that were lighter and grey in color), and would therefore be more effective. However, after a period of use her expectations were not met. The promised epic whitening of teeth did not come to fruition, and she did not feel the product freshened her breath, nor could she discern a freshening mint taste at all. She also felt the other more grey colored charcoal pastes she previously purchased had been much more effective at cleansing, whitening and freshening breath, and generally worked much better.

31.    Plaintiff Daniel Durgin ("Plaintiff Durgin" or "Mr. Durgin") resides in Boston, Massachusetts. Plaintiff Durgin purchased Hello activated charcoal fluoride-free whitening toothpaste with fresh mint + coconut oil in or about September 2019, as well as one of Hello's activated charcoal toothbrushes, at a Walmart store in Quincy, Massachusetts. He bought the

toothpaste based on claims made on the product packaging, primarily that it was labeled as a "whitening toothpaste" and that it " whitens" teeth, and he believed, based on these claims, that it would make his teeth whiter. The marketing as a whole left him with an impression that the product would be good for his teeth overall and would be safe to use. After a period of use of about three weeks, Mr. Durgin did not see his teeth become noticeably whiter. He also came across an article in the October 4, 2019 edition of Men's Health magazine,[11] and it alerted him to ineffectiveness and potential harm from charcoal toothpastes[12], and he became concerned about the use of the product (that it was not only ineffective as a whitener but that it also may not be safe to use and may cause damage to his teeth).

32.    Plaintiff John Briley ("Plaintiff Briley" or "Mr. Briley") resides in Carmel, New York. Plaintiff Briley purchased a Fluoride-Free Charcoal Toothpaste at Shop Rite in Carmel, New York. He was influenced by the advertising and marketing, which conveyed an overall sense that use of the product would result in cleaner and improved teeth. Specifically what stood out was that the product would strengthen teeth, and that it had natural teeth whitening properties and abilities. Mr. Briley expected the product to strengthen his teeth, whiten his teeth for improved personal public appearance and better oral health. After a period of use, his expectations not met.

33.    Plaintiff Sarah Patellos ("Plaintiff Patellos" or "Ms. Patellos") is a natural person and a citizen of New York. She lives within the Southern District of New York. On May 17, 2019, Ms. Patellos purchased the "hello charcoal epic whitening fluoride-free toothpaste" online on Amazon. Prior to her purchase, Ms. Patellos saw and reviewed Hello's advertising claims online

---

[11]    Christa Sgobba, "Why Brushing Your Teeth With Charcoal Toothpaste Is Stupid and Unnecessary," *Men's Health*, Oct. 4, 2019 (subtitle: "The newest whitening fad might actually increase your risk of cavities").

[12]    The Men's Health article cited a 2017 statement from the British Oral Health Foundation (warning people that the whitening effects of activated charcoal may be overblown and that brushing with it may actually put your teeth at risk), the JADA review from 2017 and research from the *Journal of Physics: Conference Series* (which found that brushing with activated charcoal increases the roughness of tooth enamel, which "can put you at risk of greater plaque accumulation, more cavities, and even periodontal disease").

on Amazon.com and the claims on the toothpaste packaging and labeling itself, and she made her purchase the toothpaste in reliance thereon. Ms. Patellos specifically relied upon representations made by Hello that the toothpaste would naturally whiten her teeth, and that it was safer and less damaging than other whitening toothpastes. She relied on the marketing and packaging that represented activated charcoal as having unique properties that added a special value, and she would not have purchased the product but-for the fact that it contained activated charcoal, the inclusion and purported benefits for which she paid a price premium. Ms. Patellos expected that the product would meet Hello's own representations (made on the product itself and online), including but not limited to that it would naturally whiten teeth, lift stains, remove toxins, and that it would be safe and gentle enough for daily use. She chose the product in part due to Hello's particular emphasis on safe and natural ingredients, as she wanted to avoid products containing damaging ingredients like sulfates. She expected that – as a 'natural' alternative to regular toothpaste – it would, in addition to whitening, adequately and safely meet dental hygiene and oral health care needs. However, after a period of use, Ms. Patellos' expectations concerning whitening were not met. The product did not effectively whiten her teeth as expected, and it also made a big mess due to its black color. Moreover, she later discovered that other promises made by Hello were false, impossible, or lacking required substantiation. For example, rather than 'naturally whitening' her teeth, the product was actually abrading her enamel, and had not been proven safe for use.

34.     Ms. Patellos has standing to assert claims on all of the Fluoride-Free Charcoal Toothpastes, because the products are nearly identical, and Hello's claims, omissions, and conduct as to her product are substantially similar as to the other flavors of Fluoride-Free Charcoal

Toothpastes, as are the injuries suffered by others as a result of the deceptive labeling and advertising.

35.     Plaintiff Eric Fishon ("Plaintiff Fishon") or ("Mr. Fishon") is a natural person and a citizen of New York. He lives within the Eastern District of New York. On February 22, 2019 on the Target website, Mr. Fishon purchased the "hello activated charcoal epic whitening fluoride toothpaste," "hello activated charcoal epic whitening fluoride-free toothpaste," and the "hello activated charcoal + hemp seed oil epic whitening fluoride-free toothpaste." He has purchased other Hello Charcoal Toothpastes on other occasions as well, including on Amazon in the spring of 2019. Mr. Fishon saw and reviewed Hello's advertising claims online (specifically, claims made online by Hello in its listing on Amazon and on the Target website) and the claims on the toothpaste packaging and labeling itself, and made his purchases in reliance thereon. Mr. Fishon purchased Charcoal Toothpastes of the fluoride and fluoride-free variety. Mr. Fishon specifically relied upon the representations that the Charcoal Toothpastes had teeth whitening and detoxifying effects from the activated charcoal, and would promote and benefit oral health, as well as strengthen teeth (as claimed on the fluoride paste). He, like Ms. Patellos, believed that the activated charcoal ingredient lent unique properties that added a special value, and he paid a premium for the inclusion of the charcoal ingredient and its purported benefits. Mr. Fishon expected that the product would meet Hello's own representations (made on the product itself and online), and that it would be safe and gentle enough for daily use and that it adequately provide dental hygiene and promote oral health. However, after a period of use, Mr. Fishon found that the products fell short of his expectations. They did not strengthen his teeth, improve or promote his oral health, or effectively whiten his teeth.

36.     Because Mr. Fishon purchased Charcoal Toothpastes of the fluoride and fluoride-free variety, he has standing to assert claims on both the Fluoride Charcoal Toothpastes and the Fluoride-Free Charcoal Toothpastes.

37.     Plaintiff Chris Smith ("Plaintiff Smith" or "Ms. Smith") resides in Aurora, Illinois. Plaintiff Smith purchased a Fluoride-Free Charcoal Toothpaste on multiple occasions at Walmart and at Target, in the time period of January 2019 through October 2019. Ms. Smith was influenced by Hello's marketing message that conveyed product use would result in health and beauty benefits including whitening and detoxification. She saw Hello's promotion of the detoxifying properties of charcoal and believed them. She relied upon claims that the product could remove stains and impurities and result in whiter teeth and fresher breath. Ms. Smith expected the product would perform as promised, but after a period of use, she was disappointed to find it had not whitened her teeth or otherwise improved her teeth, or resulted in improved or adequate oral health.

38.     Plaintiff Tawana Huston ("Plaintiff Huston" or "Ms. Huston") resides in Detroit (now Sterling Heights), Michigan. Plaintiff Huston purchased a Fluoride Charcoal Toothpaste online at Walmart.com. She had been shopping for healthy detox options in general for oral, digestive and overall body health, and was interested in charcoal products of many types. She saw and relied upon Hello's claims of epic whitening capabilities of the product, as well as the capacity for natural detoxification and removal of toxins by the activated charcoal. Her expectations of the product were not met, after a period of use.

39.     Plaintiff Tia Winston ("Plaintiff Winston" or "Ms. Winston") resides in St. Louis, Missouri. Plaintiff Winston purchased a twin pack of Fluoride-Free Charcoal Toothpastes online at Amazon.com on June 14, 2019.  Ms. Winston saw and relied upon the claims that the product would whiten her teeth, and that it would do so through the naturally whitening properties of

18

charcoal. She expected the product to whiten her teeth, but, after a period of use, she found that it had done nothing to change the color of her teeth.

40.     Plaintiff Christina Vain ("Plaintiff Vain" or "Ms. Vain") resides in Bridgeton, New Jersey. Plaintiff Vain purchased a Fluoride-Free Charcoal Toothpaste in September 2019 at a Shop Rite store. Ms. Vain saw and relied upon the "epic whitening" and "naturally whitening" claims, and also that it was safe. She liked that the product was fluoride-free and had no other potentially harmful or damaging ingredients. She expected the product to perform as promised, and promote oral health, but, after a period of use, it did not meet her expectations. It did not whiten her teeth or provide adequate oral health maintenance, and she later found it may not be safe.

41.     Plaintiff Sandra Burns ("Plaintiff Burns" or "Ms. Burns") resides in Concord, North Carolina. Plaintiff Burns purchased a Fluoride-Free Charcoal Toothpaste on August 18, 2018 at Harris Teeter Market. She relied on the claim that the product would naturally whiten her teeth. She liked that the product was BPA-free and fluoride-free and had no other potentially harmful or damaging ingredients. She expected the product to whiten her teeth as promised, but, after a period of use, she found the product did not work.

42.     Plaintiff Shannon Russell Aguirre ("Plaintiff Aguirre" or "Ms. Aguirre") resides in Summerville, South Carolina. Plaintiff Aguirre purchased a Fluoride-Free Charcoal Toothpaste at Walmart and at Target on multiple occasions. She consistently used the products for two to three years. Ms. Aguirre saw and relied upon the claims on natural and effective whitening and cleansing, and was influenced by the marketing touting the product as new, effective and natural. She expected the product to perform as promised and to result in whiter, stronger teeth and prevent oral health issues. Her expectations were not met, and the use of the products also caused major

wear on her teeth and damaged her enamel. She also got cavities. She discontinued use of after her dentist's recommendation that she do so.

43.     Plaintiff Stefanie Emerick ("Plaintiff Emerick" or "Ms. Emerick") resides in Port Bouvar, Texas. Plaintiff Emerick purchased a Fluoride-Free Charcoal Toothpaste online at Walmart.com on August 30, 2018. She later purchased a second tube from Walmart. Ms. Emerick was influenced by and relied upon claims concerning whitening, gentleness and safety, and health. She liked that the product did not contain fluoride or other potentially risky or harmful ingredients. She was very happy to have found a safer, gentler alternative to other harsher options for tooth whitening, and expected the product to perform as promised. She even told her family about the product. However, after six months of use, her expectations were dashed and in fact Ms. Emerick's teeth were in worse condition. She had never had a tooth sensitivity issue prior to use of Hello's Charcoal Toothpastes, but she now has to use Sensodyne (as recommended by her dentist after she complained of tooth sensitivity).

44.     Plaintiff Edward Blotnicki III ("Plaintiff Blotnicki" or "Mr. Blotnicki") resides in Woodruff, Wisconsin. Plaintiff Blotnicki purchased a Fluoride-Free Charcoal Toothpaste online at Amazon.com on April 30, 2018. Over a year later, on August 28, 2019, he purchased two more Fluoride-Free Charcoal Toothpastes on Amazon.com. Plaintiff Blotnicki relied on the "whitens naturally" claim, and also the brand's omission of harmful ingredients and its claim to never test on animals (after switching to a more plant-based lifestyle). He expected the product would whiten his teeth and promote stronger and healthier teeth. He believes the product did somewhat whiten his teeth, but it also caused damage in that use of the product made his teeth more sensitive.

45.     Plaintiff Romona Reed ("Plaintiff Reed" or "Ms. Reed") resides in Austin, Texas. Plaintiff Reed purchased multiple Hello products, including Hello Activated Charcoal Fluoride

Whitening Toothpaste, in both 2019 and 2020 at WalMart and Target in Austin, Texas. She was influenced by the advertising and marketing, which conveyed an overall sense that use of the product would result in cleaner and improved teeth. Ms. Reed hoped the products would remove toxins from her body and based upon Hello's advertising, would remove stains from her teeth to naturally whiten her teeth. Ms. Reed expected the product to strengthen her teeth, whiten her teeth for improved personal public appearance and better oral health. After a period of use, her expectations were not met when she found that the Charcoal Toothpastes did not remove stains from her teeth or strengthen her teeth.

46.     Each of the named Plaintiffs suffered the out-of-pocket purchase price for a falsely advertised and misbranded dentifrice(s). Their payment also reflects and included a price premium over other products sold by Hello that do not contain charcoal, as well as over competitors' products. Each of the Charcoal Toothpaste products purchased by the respective Plaintiffs did not and could not deliver the promised health and cosmetic benefits and did not possess the detoxifying, 'naturally whitening', and other properties Hello claimed. The products also lack the represented level of safety and safety substantiation. Moreover, upon information and belief (drawn from expert opinion as well as consumer complaints), use of the Charcoal Toothpastes poses some risk and is potentially detrimental to oral health and aesthetics.

47.     None of the named Plaintiffs received the promised benefits, efficacy or safety, or received the full value of their purchases. Plaintiffs' expectations were not met after use of the Charcoal Toothpastes. Later each of the Plaintiffs additionally learned more about the extent of the Charcoal Toothpastes' failure to comport with Hello's representations, including that the detoxifier claims were implausible and pseudo-scientific; that the charcoal ingredient was an unnecessarily abrasive agent on teeth and enamel; that the activated charcoal had no

'detoxification' or 'naturally whitening' or stain-lifting functions in the mouth, or other promised oral health benefits; that safety and efficacy had unsubstantiated; and that the products were potentially unsafe. They discovered that it was effectively worthless, and certainly not worthy of the price premium paid.

48.     Defendant Hello Products, LLC (aka Hello herein) is a Delaware limited liability company with its principal place of business at 363 Bloomfield Avenue, Suite 2D, Montclair, NJ 07042. Hello is licensed with the New York Department of State to conduct business in New York. Defendant is an oral care product company engaged nationwide in the business of selling toothpastes, dental floss, mouthwash, and related products to consumers from its website, www.hello-products.com, and through the brick-and-mortar and online stores of third-party retailers. Hello conducts mass marketing campaigns and distributes its Charcoal Products throughout the United States.

49.     Hello is a wholly-owned subsidiary of Colgate Palmolive Company ("Colgate Palmolive"). Upon information and belief, Hello was only recently acquired by Colgate Palmolive.

50.     The Plaintiffs have standing to pursue injunctive relief. They continue to suffer ongoing harm because of their inability to be sure that the products they purchased were safe and did not cause damage or detriment or negative consequences of which they are not yet aware. They also have an imminent threat of future harm due to the inability to rely on the veracity of the labels and advertising of Charcoal Products in the future, when deciding whether to make a purchase of another Hello dentifrice. Each of the named Plaintiffs want to purchase toothpastes that naturally and safely whiten teeth and bear other benefits, and would consider purchasing one or more of the Charcoal Toothpastes again if they could be sure that the representations and claims were truthful

and accurate, and that the products are not mislabeled or falsely advertised. As a previously misled consumer, they will lack confidence in the representations made by Hello.[13]

51.     Moreover, the dentifrices that Plaintiffs intend to buy in the future, including those that are effective for safely and gently whitening teeth and provide other cosmetic and oral health benefits, even if not branded as "Hello" or in the same product in the line of Charcoal Toothpastes at issue here, may be under brands that are owned or acquired by Hello itself or, because Hello is a subsidiary of Colgate Palmolive, by that corporation as well.[14] As such, on a broad level Plaintiffs' ability to trust in the accuracy of advertising and product labeling is, and will be compromised, absent specific injunctions ordering Defendant and its affiliates not to engage in false or misleading advertising and not to place products on the market without claim substantiation, or indeed, as long as unsafe and unsubstantiated products remain on the shelves.[15]

52.     The inability to rely on labels and advertising claims in the future is a harm to the Plaintiffs, and, because Hello continues to sell its Charcoal Products with the same advertising scheme and labeling, and its misconduct is ongoing, other consumers are currently being deceived and will continue to be deceived, just as the Plaintiffs and other consumers were previously deceived. The failure to correct these practices and provide injunctive relief goes against public policy, and the New York consumer protection laws, which broadly permit "any person who has

---

[13]     Alternatively, when considering a purchase decision in the future, each will be injured if they believe that Hello's claims have in fact been substantiated or corrected, and, as any reasonable consumer would, think it is appropriate to rely on the labeling and marketing to be truthful and non-misleading and be confident in the representations concerning the products.

[14]     *See, e.g., In re Alma Litigation*, 282 F.Supp.3d 751, 770 (S.D.N.Y. 2017) (finding standing where "Plaintiffs allege, moreover, that they "intend to buy hair products in the future, including relaxers, under brands that may be owned or acquired by L'Oreal.")

[15]     *Id*.

been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice." N.Y. GBL § 349(h).[16]

## IV.   FACTUAL ALLEGATIONS

### A.   Background on Activated Charcoal

53.    Activated charcoal is made from coal, wood, coconut shells, sawdust, bamboo, or similar ingredients. The raw material is superheated, treated with different chemicals, and then superheated a second time with steam.[17]

54.    Activated charcoal has adsorptive qualities that have proven to be quite useful in certain limited contexts. For decades, it has been used in the emergency medical treatment of certain types of poisonings and drug overdoses, because, when administered correctly, it can adsorb certain heavy metals, drugs and other toxins.[18] The effectiveness of medicinal activated charcoal in the emergency room setting is limited and dependent on specific factors, such as the type of drug, poison, or toxin, timing between ingestion of the toxin and ingestion of the medicinal charcoal, and dosage of each.[19]

55.    Activated charcoal has also been used in industrial and environmental settings to extract certain organic and in organic substances from water.[20] For example, it is sometimes used

---

[16]    *See, e.g., In re Amla Litigation*, 282 F.Supp.3d 751, 770 (S.D.N.Y. 2017)(in Article III analysis for injunctive relief standing, also taking into account the broad injunctive relief remedy under NY consumer protection statute); *see also Belfiore v. Procter & Gamble Co.*, 94 F.Supp.3d 440, 445 (E.D.N.Y 2015).

[17]    "Activated Charcoal FAQ," General Carbon Corp. [http://generalcarbon.com/facts-about-activated-carbon/activated-carbon-faq/] (last accessed June 26, 2019) (General Carbon Corp. is an activated charcoal manufacturer).

[18]    *See generally*, Robert W. Derlet & Timothy E. Albertson, "Activated Charcoal—Past, Present and Future," 145 *West J. Med.* 493 (Oct. 1986) [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1306980/pdf/westjmed00158-0063.pdf].

[19]    *Id.*; *see also* Derlet & Alberston, *supra* note 3, at 493–92 & Table 1; Jennifer A. Lowry, "Use of Activated Charcoal in Pediatric Populations," World Health Organization: Subcommittee of Expert Committee on the Selection and Use of Essential Medicines, Jan. 2008, at 2, [https://www.who.int/selection_medicines/committees/subcommittee/2/charoal_rev.pdf ] (reviewing literature on medical use of activated charcoal).

[20]    *See generally* "The History of Activated Carbon," Jurassic Activated Carbon, Feb. 9, 2014 [https://www.jurassiccarbon.com/blogs/news/12186281-the-history-of-activated-carbon].

to remove excess amounts of fluoride from drinking water.[21] It is used in juice manufacturing to control color and remove organic compounds.[22] Activated charcoal can also adsorb water-soluble vitamins, including forms of Vitamins C and B.[23]

56.     Inspired by the use of activated charcoal in these limited and particular contexts, enterprising companies like Defendant have been eager to extrapolate charcoal's adsorptive properties for use in a much broader context, often with little to no substantiation. Products containing activated charcoal are increasingly prevalent, and are promoted with vague claims of 'detoxifying' properties as well false or overstated health and beauty benefits. Activated charcoal has been marketed to the public as capable of extracting nearly any undesirable element or substance, and in nearly any context.

57.     Yet, writes Scott Gavura in *Activated Charcoal, The Wellness Scam* (Science Based Medicine, Aug. 8, 2019): "what's popularly called a 'detox' today has nothing to do with actual medical detoxification," and "[f]ake detox, the kind you find in magazines, and sold in pharmacies, juice bars, and health food stores, is **make-believe medicine. The use of the term 'toxin' in this context is meaningless…. but it sounds just scientific enough to be plausible**."[24] Mr. Gavura goes on, "if you hear the words 'detox' uttered anywhere but an emergency room, keep in mind that you're hearing a **marketing pitch, not credible health evidence**."[25] "Despite the marketing

---

[21]     Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 *Int'l Proceedings of Chem., Biological, and Envtl. Eng'g* 139 (2015) [http://www.ipcbee.com/vol82/027-IEEA2015-C3024.pdf]; *see also* Behrooz Eftekhar et al., "The Effectiveness of Home Water Purification Systems on the Amount of Fluoride in Drinking Water," *J. of Dentistry, Shiraz U. of Med. Sci.*, Sept. 2015, at 278, (noting that use of home water purification systems, including several using carbon-based filtration methods, reduced the amount of fluoride in water).
[22]     Cetin Kadakal et al., "Research Note: Effect of Activated Charcoal on Water-Soluble Vitamin Content of Apple Juice," 27 *J. of Food Quality* 171 (Apr. 2004) [https://doi.org/10.1111/j.1745-4557.2004.tb00647.x].
[23]     *Id.*
[24]     Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019 [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ].
[25]     *Id.* (emphasis added).

hype, activated charcoal has no ability to suck out the toxic chemicals from the rest of your body."[26]

58.     Multiple scientific and consumer publications have made note of this logical fallacy and have debunked the broadly asserted 'detoxifying' properties of activated charcoal (particularly in its most commonly available form as an ingestible supplement). In April 2017, Consumer Reports published *Activated Charcoal Isn't a Magic Health Bullet,* wherein Julia Calderone writes: "In recent years, people have tried to translate the very limited success of activated charcoal in the ER to their everyday lives, assuming that if it can adhere to and remove certain drugs in an emergency room, it can stop all kinds of toxins, making an already healthy person even healthier."[27] Lisa Sasson, M.S., R.D., clinical associate professor of nutrition at New York University is quoted as saying "**this logical leap is not based in science**."[28]

59.     In another example from 2017, the Superfoodly.com website published *Activated Charcoal Uses May Be Harmful, Possibly Cancerous?* stating: "The problem is that none of these cleansing/detox benefits are backed by science…. **using [charcoal] to remove toxins from your body is nonsensical**, unless you literally just ingested poison (and even then, only certain types will it absorb). There are no clinical trials or peer reviewed research which suggests activated charcoal removes toxins daily when used as a supplement."[29]

60.     Simultaneous with the charcoal trend, consumer demand for teeth-whitening products has risen. The global market for teeth-whitening products is expected to reach $7.4 billion by 2024.[30] Dentists, dental scientists, and researchers have raised concerns about the rapid growth

---

[26]     *Id*. (emphasis added).
[27]     Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/].
[28]     *Id*.
[29]     "Activated Charcoal Uses May Be Harmful, Possibly Cancerous?," Superfoodly (July 28, 2017) [https://www.superfoodly.com/activated-charcoal-uses-side-effects/].
[30]     https://www.hexaresearch.com/research-report/teeth-whitening-products-market.

of dental health 'fads,' including the use of charcoal dentifrice, which, even when "there is a lack of . . . scientifically supported information around such items, [] this does not stop them from being used."[31] As Dr. Ada Cooper, a spokesperson for the American Dental Association, recently stated: "**Just because something is popular doesn't mean it's safe**."[32]

Hello has successfully leveraged both the charcoal and detox trends as well as consumer enthusiasm for teeth whitening with its development, marketing, and sales of its Charcoal Toothpastes. In addition to the Charcoal Toothpastes, several other of Hello's other popular oral care products contain activated charcoal, including "hello charcoal mouthwash," "hello activated charcoal floss," and "hello toothbrush with activated charcoal."[33] Just as it does with its Charcoal Toothpastes, Hello touts these products as safe, detoxifying, adsorptive, and/or possessive of whitening and other beneficial properties.

### B. Contemporary Scientific Studies Challenge the Safety and Efficacy of Activated Charcoal for Use in Dentifrice

61.     The first use of charcoal for oral hygiene dates back to Hippocrates in ancient Greece.[34] The Romans apparently followed this practice, along with other questionable oral care practices such as rinsing their mouths with urine.[35]

62.      In the United States, there have been several attempts to introduce charcoal as an oral health product. According to commentary published in the Journal of the American Dental

---

[31]      Marco Antonio Dias da Silva & Anthony Damien Walmsey, "Fake News and Dental Education," 226 *British Dental Journal* 397, 397-99 (2019).

[32]      "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/]. (emphasis added).

[33]      "Charcoal Products," Hello Products, https://www.hello-products.com/shop/charcoal/ (last accessed June 25, 2019).

[34]      *See* S.W.B. Newsom, "Hygiene and the Ancient Romans," *J. of Infection Prevention*, at 25, June 2004 [https://journals.sagepub.com/doi/abs/10.1177/14690446040050030601].

[35]      C. Valerius Catullus, "On Egnatius of the White Teeth," circa B.C. 84–54, (Tr. Richard Francis Burton, 1894), [http://www.perseus.tufts.edu/hopper/text?doc=Perseus:text:1999.02.0005:poem%3D39] (poem by the Roman poet Catullus referring to the practice of whitening teeth by rinsing with urine).

Association ("JADA") in 1932, a product named "Kramer's Original Charcoal Dental Cream," had been pronounced "not acceptable" as an Accepted Dental Remedies (ADR) by the Council on Dental Therapeutics (the "Council"). The Council found that "[c]linical experiences are recorded in which the particles of charcoal became imbedded in the gum tissue and produced a bluish line near the margin, which is removable only by surgical means."[36] When the Kramer's brand produced no evidence to rebut the clinical results, the Council denied it as an ADR "because it is a dentifrice intended for daily use that contains **charcoal, a potentially harmful substance**."[37]

63.     Decades after American dentistry rejected charcoal for use in dentifrice, the topic has again resurfaced, in light of the burgeoning consumer trend. One study, presented at the Academy of General Dentistry 2015 Annual Meeting, concluded that "activated charcoal was more abrasive than a whitening toothpaste on acrylic resins" and warned that "[t]he fine black charcoal powder may become embedded in defects such as margins or cracks present on older dentition."[38]

64.     In 2017, the Journal of the American Dental Association published a literature review to "examine the efficacy and safety of charcoal and charcoal-based dentifrices." John K. Brooks et al., *Charcoal and Charcoal-Based Dentifrices*, 148 JADA 661 (2017) (referred to herein as "*Charcoal-Based Dentifrices* (JADA 2017)" or "the 2017 JADA article"). The authors, Dr. John Brooks, DDS, Dr. Nasir Bashirelahi, PhD, and Dr. Mark A. Reynolds, DDS, PhD, reviewed the first 50 consecutive charcoal dentifrices from Google.com and Amazon.com to assess how the

---

[36]     John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 JADA 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).
[37]     *Id.* (emphasis added).
[38]     Brantley McCarty et al., "Activated Charcoal as a Whitening Dentifrice," Presented at Academy of General Dentistry 2015 Annual Meeting, June 18–21, 2015, San Francisco, CA [https://www.epostersonline.com/agd2015/node/72] (last accessed June 5, 2019).

marketing claims of these products compared with efficacy and safety of charcoal-based dentifrices as found in the available scientific literature.[39]

65.     The authors of *Charcoal-Based Dentifrices* (JADA 2017) reviewed advertising claims about the charcoal-based dentifrices on the market, and found: "Nearly one-half of the charcoal-based dentifrices were advertised as being capable of detoxification, with most claiming to detoxify the oral cavity or teeth. **Our review failed to identify scientific support in the literature that topical application of charcoal can provide any detoxification benefits to the teeth or oral mucosa.**"[40]

66.     The authors of the 2017 JADA article additionally reported that "**[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth preparations raises concern about damage to these oral structures, as well as increasing caries susceptibility due to the potential loss of enamel**."[41]

67.     The 2017 JADA article further noted that in the charcoal-based toothpastes containing fluoride, the **fluoride might "be rendered either chemically inert or minimally effective, as charcoal is a well-known absorptive agent capable of inactivating fluoride**."[42]

68.     In conclusion, the authors of *Charcoal-Based Dentifrices* (JADA 2017) stated:

In our literature review, **we found insufficient scientific evidence to substantiate the cosmetic, health benefits** (antibacterial, antifungal, or antiviral; **reduced caries; tooth whitening; oral detoxification**), **or safety claims** of marketed charcoal-based dentifrices. **Controlled clinical trials and laboratory investigations of charcoal-based dentifrices . . . are needed to determine product efficacy and safety**.[43]

---

[39]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[40]     *Id.* (emphasis added). The authors were unable to identify any randomized, controlled clinical trials with a follow-up duration of 3 months or longer testing the safety or effectiveness of charcoal-based dentifrices. All of the available studies lacked adequate controls to measure clinical oral improvements with charcoal-based dentifrices.
[41]     *Id.* (emphasis added).
[42]     *Id.* (emphasis added).
[43]     *Id.* (emphasis added).

69.     In May 2019, the British Dental Journal confirmed that supporting scientific evidence remained lacking, and again raised the same and similar concerns reflected in the 2017 JADA article. Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 BDJ 697, 698 (2019) (referred to herein as "*Charcoal-Containing Dentifrices* (BDJ 2019)" or "the 2019 BDJ article"). It further noted the tendency for build up of charcoal particles in surface defects, fissures, and gumline, and resulting poor aesthetic effects.[44]

70.     The May 2019 article in the BDJ, *Charcoal-Containing Dentifrices* (BDJ 2019), concluded that charcoal-based dentifrices "may be considered to be **a fashionable, marketing 'gimmick'**" that is "based on folklore on the use of different forms of charcoal for oral and dental remedies," or improperly based on "present day uses of charcoal for medical purposes."[45] The 2019 BDJ article lamented the prevalent and "**worrying approach**" in the marketing of charcoal dentifrices that places "a strong emphasis on benefits which appeal to consumers, which have yet to be disproved," and that favor a "'scientifically claimed until proved wrong' approach . . . over substantiated, evidence-based promotion."[46] The authors opined that "**the ethics of such an approach to the marketing of health-influencing products is at best questionable. False and deceptive messaging, together with the selective provision of information could be classed as misleading practice, contrary to the consumers' best interests and protection.**"[47]

C.     **The American Dental Association has Not Approved any Activated Charcoal Dentifrice for its ADA Seal of Acceptance**

---

[44]     *Id.*
[45]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, 698 (2019).
[46]     *Id.* (emphasis added).
[47]     *Id.* (emphasis added).

71.     The American Dental Association ("ADA") was founded in 1859.[48] Per the ADA's description of its mission, the ADA "exists to power the profession of dentistry and to assist our members in advancing the overall oral health of their patients."[49] ADA presents itself as a "strong advocate[] for public health" working with an aim to keep patients "healthy from the dental chair to daily care at home."[50]

72.     In furtherance of the ADA's public health goals, the organization administers the ADA Seal of Acceptance Program ("Seal Program"), which began in 1931.[51] The ADA established its Seal Program to combat "extravagant claims" about what dental products could do.[52] Since that time, the ADA Seal of Acceptance has become "[u]niversally recognized by consumers as a symbol of safety and effectiveness" and "is carried on more than 300 oral health products, including toothpastes, toothbrushes, dental floss, mouth rinses, denture adherents, and chewing gum."[53] Companies can submit dental products to the Seal Program by including "data from clinical or laboratory studies that demonstrate safety and efficacy according to product category requirements developed by the ADA Council on Scientific Affairs."[54] Members of the ADA Council review submissions for adherence to product category requirements and, if necessary, utilize consultants with relevant specific area expertise.[55] Once a product's safety and efficacy has been demonstrated, the ADA Council will award the Seal of Acceptance.[56]

---

[48]     https://www.ada.org/en/about-the-ada/ada-history-and-presidents-of-the-ada (last accessed November 18, 2019).

[49]     https://www.ada.org/en/about-the-ada (last accessed November 18, 2019).

[50]     Id.

[51]     https://www.ada.org/en/science-research/ada-seal-of-acceptance (last accessed November 18, 2019).

[52]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What is the ADA Seal?" (last accessed November 18, 2019).

[53]     https://www.ada.org/en/about-the-ada (last accessed November 18, 2019).

[54]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "What determines if a dental product qualifies for the Seal?" (last accessed November 18, 2019).

[55]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-faq, "How are products evaluated?" (last accessed November 18, 2019).

[56]     Id.

73.     A variety of major brands have sought and received the ADA Seal of Acceptance for certain products, including, but not limited to, Crest, Efferdent, ACT, CVS, Equate (Walmart), Listerine, Up and Up (Target), Oral-B, and Colgate.[57] **Significantly, the ADA has not granted the ADA Seal of Acceptance to any product with activated charcoal**.[58]

74.     Hello has not received the ADA Seal of Acceptance for the products named herein.

75.     However, Hello *has* received the ADA Seal of Acceptance for other oral care products it has developed, marketed and sold to consumers, including the following products: "hello kids fluoride rinse," "hello kid's fluoride toothpaste," and "hello naturally whitening fluoride toothpaste."[59]

76.     Based upon the prevailing scientific literature regarding the lack of substantiation on safety and efficacy of activated charcoal in dental products, and the known risks and abrasiveness of charcoal, coupled with Hello's prior experience with the ADA Seal Program, Hello was or should have been aware of the unsuitability of the ADA Seal of Acceptance for its Charcoal Toothpastes. Nevertheless it has chosen to make the exact sort of false, deceptive, and/or misleading extravagant claims that inspired the creation of the ADA's Seal Program.

**D.     Hello's Representations on the Charcoal Products' Labeling, Packaging, Advertising, and Marketing**

77.     Since at least 2015, Defendant has packaged, marketed, distributed, and sold some or all of its Hello Charcoal Products. Examples of the external cardboard boxes, product packaging and tubes include:

---

[57]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed November 18, 2019).
[58]     *See* https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed November 18, 2019).
[59]     https://www.ada.org/en/science-research/ada-seal-of-acceptance/ada-seal-shopping-list (last accessed November 18, 2019).





78.     Printed on the external cardboard packaging of the Charcoal Toothpastes is the following:



The above packaging bears a logo stating "black paste works brilliantly" and invites the consumer to "**learn more and smile more at helloproducts.com**." The printed text in the black section of the packaging states:

> "**what's up with charcoal?**
> black paste might look weird, but it works brilliantly. the activated charcoal (made from sustainable bamboo) is a detoxifier that removes surface stains and freshens breath. a friendly word of advice: black paste can be messy. please spit responsibly and clean the sink once you've rinsed ;-)."

79.    All of Hello's toothpaste tubes and packaging include an ingredient list with parentheticals that describe the function of each ingredient. The ingredients list printed on the tube and cardboard packaging for each of the Charcoal Toothpastes includes, *inter alia*: "**Charcoal powder (whitens, polishes and cleans teeth/freshens breath).**"

80.    The tubes and cardboard packaging for *each* of the Charcoal Toothpastes state: "**use: whitens, helps remove plaque with regular brushing.**"

81.    Featured predominantly in the printed labeling of the tubes and cardboard packaging for *all* but one of the currently available Charcoal Toothpastes is the claim: "**epic whitening.**"

82.    The following claims are printed on the external cardboard packaging of *each* the **Fluoride-Free Charcoal Toothpastes**:

- "**noticeably whiter teeth**" or "**whitens naturally**"

34

- "**removes plaque**"

- "**freshens breath**" or "**slays dragon breath**" or "**mind blowing freshness**"

83.     The following claims are printed on the external cardboard packaging of the **Fluoride Charcoal Toothpastes**:

- "**noticeably whiter teeth**"

- "**prevents cavities**"

- "**safe for enamel**"

- "**awesome for fresh breath**"

84.     On its website, Hello makes the following claims regarding the **Fluoride-Free Charcoal Toothpastes**, as well as the purpose and benefits of activated charcoal in its oral care products:



- "**a friendly force of nature**. say hello to activated charcoal, **a natural whitener and detoxifier** that helps make smiles brighter and breath fresher. now that's pretty coal."[60]
- "it's simple, **black paste = white teeth**."[61]
- "**our activated charcoal toothpaste whitens naturally and gently without peroxide, and is safe for everyday use**. beyond whitening teeth, **it kicks plaque to the curb**. . . ."[62]
- "this paste is **specially formulated with activated charcoal** (made from sustainable bamboo), **an epic whitener and detoxifier that removes surface stains**. . . ."[63]
- "**thoughtfully formulated with activated charcoal** (made from sustainable bamboo) and dragon fruit, our paste slays dragon breath, **vanquishes stains, whitens epically** . . . . #brushhappy"[64]
- "this fluoride free superpasteTM is **thoughtfully formulated for daily use with activated charcoal (made from sustainable bamboo), which helps epically whiten your teeth** and freshen your breath like nobody's business. it's so fab, you'll be saying ah-sah-yee-ha. #brushhappy"[65]

85.     Regarding the **Fluoride Charcoal Toothpastes**, the site states:

"activated charcoal (made from sustainable bamboo) **is nature's way to epically whiten teeth** and freshen your breath like nobody's business. here at hello, we believe in a brusher's right to choose, **so this charcoal paste contains fluoride, which helps to prevent cavities and strengthen enamel**. if fluoride isn't your thing, we have a fluoride free charcoal paste, too. and **don't worry, our charcoal toothpastes have been specifically formulated to be gentle enough for daily use**."[66]

86.     Hello's website also includes a short article titled "why add charcoal to toothpaste?"

written by Connie Gregson.[67] Ms. Gregson is identified as the "friendly head of r+d at hello

products" who "created the formulations of our products." The website describes her as having

---

[60]     Shop Charcoal, Hello-Products.com, https://www.hello-products.com/shop/charcoal/ (last accessed September 25, 2019).
[61]     https://www.hello-products.com/shop/charcoal-whitening-toothpaste/ (last accessed September 25, 2019).
[62]     https://www.hello-products.com/product/charcoal-whitening-toothpaste/ (last accessed September 25, 2019).
[63]     https://www.hell)o-products.com/product/charcoal-whitening-hemp-toothpaste/ (last accessed September 25, 2019) (regarding the "+ hemp seed oil epic whitening fluoride free" superpasteTM).
[64]     https://www.hello-products.com/product/charcoal-whitening-dragonfruit-toothpaste/ (last accessed September 25, 2019) (regarding the "+ natural dragon fruit epic whitening fluoride free" superpasteTM).
[65]     https://www.hello-products.com/product/charcoal-whitening-acai-toothpaste/ (last accessed September 25, 2019) (regarding the "+ natural acai epic whitening fluoride free" superpasteTM).
[66]     https://www.hello-products.com/product/activated-charcoal-whitening-fluoride/ (last accessed September 25, 2019) ('hello activated charcoal epic whitening fluoride toothpaste with fresh mint + coconut oil').
[67]     https://www.hello-products.com/about/ingredients/activated-charcoal/ (last accessed September 25, 2019).

"more degrees than a thermometer," including an MS in food biochemistry, and states that she was formerly a research scientist for Pepsi before "deciding to focus on cavity prevention and optimized oral health."  Notable statements from Ms. Gregson include the following:

"charcoal is associated with many things: barbeque grilling and chilling, whiskey distilling and swilling, multitasking and facial masking, etc. but as it turns out, **charcoal's also a powerful teeth whitener**. yep you heard us correctly."

"**the tooth-whitening variety of charcoal is known as activated charcoal**, and **it's been designed to safely go where no charcoal has (hopefully) gone before: inside your mouth**."

"activated charcoal is formed when high pressure gas is forced into charcoal making it much more porous. **this porousness makes it extremely adsorptive**. and yes, you read that right: we said "adsorptive" – not absorptive. the difference is that **activated charcoal literally "adds" to its mass by grabbing other molecules**. hence adsorption. think a static-y cloth that cleans by getting stuff to cling, as opposed to a paper towel that's soaking up a liquid. **this structure helps activated charcoal adsorb the odors that cause bad breath and the tannins that can stain teeth**, **when used in toothpaste form, the charcoal can get into nooks and crannies really well**."[68]

87.     Hello makes the same and similar claims elsewhere online, including Amazon.com:

---

[68]     https://www.hello-products.com/about/ingredients/activated-charcoal/ (last accessed September 25, 2019).

**take a brush on the wild side.**

say hello to activated charcoal (made from sustainable bamboo), nature's way to epically whiten teeth, detoxify your mouth and freshen your breath like nobody's business. it's been specifically formulated to be safe for enamel, so use hello every time you brush for maximum friendliness. please spit responsibly and clean your sink after each use. #brushhappy





- · provides noticeably whiter teeth.
- · detoxifies and freshens breath.
- · gentle and safe for everyday use.
- · vegan, made in the usa, and never tested on animals.
- · no alcohol, peroxide, artificial sweeteners/flavors, sls/sulfates, dyes, microbeads, parabens, and gluten.
- · *Certified Cruelty-Free and Vegan through PETA since 01/26/2016, Cert_#0000016 2, *This product is certified BPA free by CCL as of 4/8/2010 TSB-1016A
- · **Please see ingredients label to verify all components of this product.

we think it's time personal care was, well, personal. relevant. beautiful. delicious. friendly. and as natural as we can make it. we're on a mission to make the world a friendlier place, starting with your mouth. hello is a new kind of naturally friendly™ oral care, created by an entrepreneurial bunch using thoughtful ingredients so delicious you'll rush to brush. for reals.



**black paste = white teeth.**

crazy concept, we know, but this black paste will whiten like nobody's business. a friendly word of caution: black paste can get a little messy if you're not mindful. please remember to spit responsibly.



**get black to nature.**

our charcoal line features thoughtful ingredients like coconut oil, tea tree oil and xylitol that are sure to rock your world. bonus, the delicious mint found in our pastes is grown in the willamette



**your swish come true.**

our black rinse (yup, it's black) is thoughtfully formulated to make swishing fun and friendly. it rocks activated charcoal from sustainable bamboo, a natural detoxifier that keeps breath next-level

**E.    The Claimed Benefits of the Charcoal Toothpastes are Materially Misleading and are Debunked or Unsubstantiated by Scientific Evidence, Impossible and/or Untrue**

**(i)    *Detoxifying and Adsorbing***

88.    Hello's marketing of the Charcoal Toothpastes highlights the purported detoxifying and adsorptive properties of activated charcoal. For example, the product packaging states the charcoal is "a detoxifier that removes surface stains and freshens breath." Hello's website presents activated charcoal as "a natural whitener and detoxifier that helps make smiles brighter and breath

fresher. now that's pretty coal."[69] Additional examples of the way in which Hello characterizes

the benefits and functions of charcoal as an adsorptive detoxifier are reflected above in Section D.

89.     In reality, Hello's claims are specious and make misuse of the term

"detoxification." As previously discussed, detoxification is a *medical term* that refers to emergency

treatments for dangerous levels of drugs, alcohol, or poisons, like heavy metals.[70] Moreover, there

are no clinical trials or peer reviewed research which suggests activated charcoal removes toxins

daily when used as a supplement."[71]

90.     Even more implausible than the 'detoxifying' effects of ingestible charcoal

supplements, are purported 'detoxifying' properties in topically applied personal care products

containing charcoal, such as dentifrice. The logic of employing charcoal in this context is even

more attenuated and is, in fact, *wholly unsupported*. As one wellness writer has put it:

> "**At the root of the activated charcoal health fad is the misuse, or misunderstanding, of the word 'toxin.'** In a detox-crazy world, toxins are used to refer to impurities or anything undesirable in your body: **stains on your teeth**, dirt or dust on your skin, naturally present sugars in your juice, a hangover after a night out. **Personal care products (like teeth whiteners**, face masks, soaps, shampoos, and deodorants) containing activated charcoal **bank on the idea that impurities can be draw out during use**. . . But **there is little to no research to prove that the trace amounts of activated charcoal, combined with other ingredients, in these products are effective and much more than just marketing**."[72]

---

[69]     Shop Charcoal, Hello-Products.com, https://www.hello-products.com/shop/charcoal/ (last accessed September 25, 2019).

[70]     Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019 [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ].

[71]     "Activated Charcoal Uses May Be Harmful, Possibly Cancerous?," Superfoodly (July 28, 2017) [https://www.superfoodly.com/activated-charcoal-uses-side-effects/]; Scott Gavura, "Activated Charcoal, The Wellness Scam," *Science Based Medicine*, Aug. 8, 2019 [https://sciencebasedmedicine.org/activated-charcoal-the-wellness-scam/ ]; Julia Calderone, "Activated Charcoal Isn't a Magic Health Bullet," Consumer Reports (April 13, 2017) [https://consumerreports.org/dietary-supplements/activated-charcoal-fad-not-a-magic-health-bullet/].

[72]     Katie Mui, "Activated Charcoal: The Powerful Detox Ingredient You Don't Want in Your Regular Diet," GoodRx, Feb. 7, 2019 [https://www.goodrx.com/blog/what-is-activated-charcoal-detox-medication-interactions/]. (emphasis added).

91.     Despite the lack of scientific substantiation, Hello goes to great length to bolster the plausibility of its claims. On its website Hello provides incredulous descriptions of how charcoal's porousness and adsorptive qualities enable it to not only 'detoxify,' but also lift stains, remove plaque, whiten teeth, freshen breath, and provide other oral health benefits. Hello explains charcoal's adsorption function as one "that cleans by getting stuff to cling" and "grabbing other molecules," and "adsorb the odors that cause bad breath and the tannins that can stain teeth."[73]

92.     Hello's detoxification and other claims (including its functionality claims, such that charcoal kicks plaque to curb and removes stains through the process of adsorption) are a marketing gimmick with no basis in fact.[74] The same or very similar consumer-appealing claims have been assessed by dental experts and determined to be unsupportable (see, e.g., the 2017 JADA and 2019 BDJ articles).  Put simply, **there is no scientific support** "**that topical application of charcoal can provide any detoxification benefits to the teeth or oral mucosa**."[75] This includes "antibacterial, antifungal, or antiviral" benefits, as well as reduced caries or a more general (and ill-defined) notion of "oral detoxification."[76]

**(ii)     *Naturally Whitening***

93.     Hello's whitening claims for the Charcoal Toothpastes (made on its product packaging, labeling, marketing and advertising) include but are not limited to: "epic whitening," "noticeably whiter teeth," "whitens naturally," "it's simple, black paste = white teeth." See Section D above.

---

[73]     https://www.hello-products.com/about/ingredients/activated-charcoal/ (last accessed September 25, 2019).

[74]     To the extent charcoal-based dentifrices do appear to effectuate certain purported oral hygiene or aesthetic benefits, it is not its porousness, but rather the *high abrasiveness* of the charcoal particle that enables any seemingly positive results, and in a short-sighted and risky manner.

[75]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

[76]     *Id*.

94.     When a toothpaste or toothpowder is advertised as "whitening," most reasonable consumers believe it will leave their teeth whiter. However, dentists and researchers have warned that charcoal dentifrice companies' "whitening" claims are misleading, due to the failure to clarify the distinction between intrinsic and extrinsic whitening mechanisms. As opposed to intrinsic whiteners, the British Dental Journal explains, many "products whiten teeth, to different extents, by the removal of surface (extrinsic) stains, which may reform relatively quickly in, for example, a smoker. Typically, these products do not change the intrinsic colour of the tooth, which is largely determined by the colour of the dentine."[77]

95.     Linda Greenwell, in her 2017 article *Charcoal Toothpastes: What We Know So Far*, concluded: "[t]here is no evidence that the use of charcoal toothpaste has an effect on intrinsic (internal) staining of teeth or on intrinsic whitening of the teeth."[78] In 2019 Ms. Greenwell, as co-author *Charcoal-Containing Dentifrices* (BDJ 2019), re-affirmed the conclusion that activated charcoal "does not change the colour of the teeth other than by abrasive action similar to that of a 'smoker's toothpaste'. . . ."[79] "The common interchangeable use and misuse of the terms 'whitening' and 'bleaching' is therefore misleading and confusing to consumers and patients, with the marketing of some charcoal and other dentifrices being no exception."[80]

96.     The Hello Charcoal Toothpastes do not intrinsically whiten teeth. As such, any claimed "whitening" properties of the Hello Charcoal Toothpastes are limited to the removal of extrinsic surface stains, and therefore misleading.[81]

---

[77]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental J.* 697, 699 (2019).
[78]     Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017) [https://www.pharmaceutical-journal.com/opinion/correspondence/charcoal-toothpastes-what-we-know-so-far/20203167.article?firstPass=false].
[79]     Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental J.* 697, 699 (2019).
[80]     *Id*.
[81]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

97.     Hello's whitening claims are deceptive for the additional reason that it presents the Charcoal Toothpastes as possessive of "naturally" whitening qualities due to the unique and inherent attributes of activated charcoal – essentially that whitening is effectuated by adsorbing and lifting stains.

98.     This is misleading and deceptive. Charcoal functions as an abrasive agent. Its composition and fractal-shaped particles make it highly abrasive to tooth enamel.[82] As such, any extrinsic stain-lifting that could be viewed as 'whitening' is achieved simply by mechanical abrading of extrinsic stains, and is *not achieved from adsorptive qualities of the charcoal*; rather it is achieved by the *particularly abrasive effects of the charcoal*.

99.     Put another way, the Charcoal Toothpastes "work" to "whiten" teeth through abrading away the stains and deposits having the charcoal particles scrape off the surface of the teeth, i.e. the tooth enamel. The adsorptive qualities of charcoal are irrelevant in the context of purported teeth whitening, and Hello's representations in this regard are misleading and deceptive, similarly to its frivolous 'detoxifying' claims.

100.    Abrasive ingredients are commonly used in dentifrice and function to mechanically lift extrinsic stains, reduce the adhesion of dental biofilms and chromophores from the enamel surface, and otherwise improve discoloration and clean the teeth. However, there are numerous commonly accepted and widely used abrasives that are effective and more gentle than charcoal, and have undergone clinical testing as well as ADA scrutiny. There are no long-term clinical studies of the effects of its use, and charcoal (which is particularly abrasive due to its unique particle shape and composition) is not in the ADA-approved list of abrasives.

---

[82]     *See, e.g.,* Matthias Epple et al., "A Critical Review of Modern Concepts for Teeth Whitening," 79 *Dentistry J.*, 7 (Aug. 1, 2019) [https://www.mdpi.com/2304-6767/7/3/79/htm].

101.     Lastly, and arguably at worst, consumer experience and dental expert opinions alike indicate that long-term use of the Hello Charcoal Toothpastes could potentially result in a darkened and yellow tooth appearance. This is because, when teeth are regularly brushed with highly abrasive substances such as charcoal, the enamel can wear down and cause the tooth's dull, internal dentin to show through. As Dr. Ada Cooper, spokesperson for the American Dental Association, has explained: "Using materials that are too abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[83] Furthermore, the removal of enamel by abrasive whitening dentifrices not only exposes the yellowish dentin, but also causes teeth to stain even more easily in the future – with the sensitive dentin exposed and no longer protected by enamel.

### (iii)     *Safe, gentle, effective and adequate for dental hygiene maintenance with daily, long-term use*

102.     On its website, Hello has an FAQ section that states: "**are hello products safe?**" and provides the response: "**a resounding YES**."[84] Hello bombards consumers with a 'friendly' and 'natural' messaging intended to leave a strong impression that the brand is *extremely* conscientious of health, safety and wellbeing. Hello presents its Charcoal Products as "naturally friendly," "thoughtfully designed," and also free of numerous ingredients that are increasingly considered undesirable or unnatural (such as sls/sulfates, parabens, and BPA).[85]

---

[83]     "Beware Whitening Promise of Charcoal Toothpastes," The Family Dental Center, Mar. 2019, [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

[84]     Frequently Asked Questions, Hello-Products.com, https://www.hello-products.com/faq (last accessed June 25, 2019).

[85]     "hello charcoal teeth whitening toothpaste is fluoride free, vegan, and free from sls/sulfates, artificial sweeteners/flavors, parabens, microbeads, triclosan, and gluten. like all of our pastes, it's made in the USA with globally sourced ingredients in BPA-free tubes, and of course, we never test on animals – that would be insanely unfriendly. brush happy."   https://www.hello-products.com/product/charcoal-whitening-toothpaste/ (last accessed September 25, 2019).

103.     Printed on the Charcoal Toothpastes' toothpaste tubes and packaging is Hello's claim that oral benefits come "with regular brushing." Hello describes its Fluoride-Free Charcoal Toothpastes as "safe for everyday use," to achieve whitening "naturally and gently." The Fluoride Charcoal Toothpastes are also designated for daily use, and furthermore are specifically claimed to be "safe for enamel."

104.     The packaging instructions and marketing statements send the message that consumer use of the Charcoal Toothpastes should approximate a regular brushing routine and that the products are appropriate for a consumer to use as their primary everyday source of oral hygiene.

***Abrasive damage to enamel and gums***

105.     While proclaiming that the Charcoal Toothpastes are gentle and safe for daily long-term use, Hello also fails to disclose material facts, such that activated charcoal has *not* been substantiated as safe and effective for use in dentifrice, and both JADA and the BDJ have confirmed insufficient scientific evidence to substantiate safety claims (as well as cosmetic and health benefits) as well as raised concerns about risks associated with the use of charcoal dentifrices.

106.     Activated charcoal is known to be a highly abrasive and harmful substance to tooth enamel.[86] Multiple scientific studies have noted its abrasiveness presents a risk to enamel and gingiva in the context of oral care products. As noted in the 2017 JADA article: "[c]harcoal has been recognized as an abrasive mineral to the teeth and gingiva, and its inclusion in tooth preparations raises concern about damages to these oral structures, as well as increasing caries

---

[86]     *See, e.g.*, John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 785 (2017) [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)) (Concluding a charcoal dental cream was not an acceptable dental remedy "because it is a dentifrice intended for daily use that contains charcoal, a potentially harmful substance").

susceptibility due to the potential loss of enamel."[87] The 2019 BDJ article again noted the risk to enamel and gingiva posed by charcoal's abrasivity.[88]

### Oral health effects from abrasive damage

107.    Moreover, the abrasive damage to tooth enamel caused by charcoal can set the stage for spiraling into additional oral health issues. It has been shown that increased surface roughness of teeth creates an environment conducive to increased bacteria in the oral cavity. This, in turn, can lead to other problems and is correlated with high caries and periodontal disease.

108.    On a general level, the optimal formulated toothpaste maximizes cleaning while minimizing abrasiveness. The abrasives employed in a toothpaste should effectively polish teeth and remove biofilms and stains, but not abrade on the tooth structure itself. The findings of a controlled scientific study, published in a 2017 article, *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, confirmed that charcoal-based toothpastes are more abrasive and affecting on the surface roughness on a tooth as compared to other non-charcoal whitening toothpastes.[89] Charcoal's abrasiveness is related to its composition and its irregular "star shaped" particles.[90] The "research concluded that there were increasing surface roughness values of tooth surfaces after the use of toothpaste containing charcoal, and the increased surface roughness was statistically significant . . . ."[91] Increased surface roughness on a tooth's enamel is "a strategic place for bacteria to adhere to the tooth's surface," and "[t]he presence of bacteria in the oral cavity is one of the causes of high caries and periodontal disease risk."[92]

---

[87]      John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).
[88]      Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).
[89]      U I Pertiwi et al., *Surface Changes of Enamel After Brushing with Charcoal Toothpaste*, IOP Conf. Series: Journal of Physics: IOP Conf. Series 884 (2017) [iopscience.iop.org] (doi:10.1088/1742-6596/884/1/012002).
[90]      *Id.*
[91]      *Id.*
[92]      *Id.*

109.    Still more problematic, experts have noted that certain characteristics of Charcoal Toothpastes tend to prolong users' brushing time and increase brushing vigorousness, which can serve to *further exacerbate the abrasive effect* of charcoal dentifrices. The first such characteristic is the distinct black color of pastes containing charcoal. "Charcoal-containing toothpastes are black in colour and brushing off the colour tends to prolong brushing, or the use of excessive brushing force, which may lead to the abrasion of teeth."[93] The same phenomena occurs with dentifrices claimed to have 'whitening' properties, as consumers might brush more frequently and vigorously to achieve the desired whitening more quickly, not realizing that "excessive brushing with a charcoal-based dentifrice may cause more harm than good."[94]

### Negative aesthetic results

110.    Studies also show bad aesthetic effects in some users. "Particles of charcoal included in charcoal toothpaste may accumulate in crevices and other defects in teeth, including cracks in the teeth of older individuals."[95] For "patients with established periodontal disease," the use of charcoal-based dentifrices may result in "the accumulation of charcoal particles deep in periodontal defects and pockets, causing grey/black discoloration of the periodontal tissues."[96]

111.    Studies have shown that the staining and discoloration caused by charcoal dentifrices can impact dental implants. When grey lines are created by the buildup of charcoal particles between dental restorations and teeth, it can ultimately "necessitate the costly replacement of the affected filings, veneers or crowns."[97]

---

[93]    Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).

[94]    Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019). (emphasis added).

[95]    Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).

[96]    Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).

[97]    Linda Greenwall & Nairn H.F. Wilson, Opinion, "Charcoal Toothpastes: What We Know So Far," *Clinical Pharmacist* (July 13, 2017).

***Potential for compromised efficacy of the Fluoride Charcoal Toothpastes***

112.     As a dentifrice ingredient, fluoride is an effective agent known to protect against cavities and tooth decay; help mineralize teeth to avoid tooth breakdown; and help prevent bacterial overgrowth in the mouth. Under the applicable federal regulatory framework (discussed more fully *infra*), toothpastes containing fluoride are regulated as drugs (as opposed to cosmetics), since fluoride is an anti-cavity agent and can affect the structure of the tooth. Because they contain fluoride, and also by merit of the claims made on its packaging, the Fluoride Charcoal Toothpastes are classified as anticaries drugs and regulated as such by the FDA, in particular by the FDA's Anticaries Monograph.

113.     It is well known that charcoal can strongly affect fluoride, and is sometimes used to extract fluoride from community water supplies.[98] The 2017 JADA article noted that fluoride might "be rendered either chemically inert or minimally effective" in a toothpaste containing charcoal.[99] The 2019 BDJ article noted that "any fluoride and other active ions in charcoal-based toothpaste may not be available in use to affect enhanced cleaning or chemical changes to the tooth substrate."[100] "As such, charcoal-based toothpastes, despite containing fluoride may have limited capacity to remineralise enamel, let alone increase its resistance to caries and tooth wear processes."[101]

114.     On the labeling, Hello claims its Fluoride Charcoal Toothpaste "prevents cavities" and "safe for enamel," and on its website states it "helps to prevent cavities and strengthen enamel."[102] Sec. D. However, the fluoride in the Fluoride Charcoal Toothpastes may be impacted

---

[98]     See, e.g., Manisha Poudyal & Sandhya Babel, "Removal of Fluoride using Granular Activated Carbon and Domestic Sewage Sludge," 82 *Int'l Proceedings of Chem., Biological, and Envtl. Eng'g* 139 (2015)

[99]     John K. Brooks et al., "Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 661 (2017).

[100]     Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).

[101]     Linda H. Greenwall et al., *Charcoal-Containing Dentifrices*, 226 British Dental Journal 697, (2019).

[102]     https://www.hello-products.com/product/activated-charcoal-whitening-fluoride/ (last accessed September 25, 2019).

or inactivated by the charcoal. Class members who purchased Fluoride Charcoal Toothpastes, were potentially deprived of the dental benefits they thought they would receive by purchasing one of the Fluoride Charcoal Toothpastes, including preventing cavities and/or strengthening enamel, because the fluoride it contains has been potentially been effectively rendered inert.[103]

### *The replacement of widely accepted ingredients with charcoal (whose safety and efficacy has not been established) jeopardizes consumers' oral hygiene and oral health*

115.    Researchers have warned that marketers' overhype of purported health and safety benefits of charcoal dentifrices can cause consumers to believe they are making safe and responsible choices but unwittingly risk their long-term oral health. Extreme marketing tactics, broad and exaggerated marketing claims and deceptive and false promises, in the absence of disclosures of the truth about inadequate substantiation, cause consumers to purchase and use a charcoal dentifrice, often in lieu of a non-charcoal dentifrice that *has* in fact been established as safe and effective. As the 2019 BDJ article authors noted:

> "The unsubstantiated claims that certain charcoal-based dentifrices, any of which are described as eco-friendly, ecological, herbal, natural, organic or pure, have antibacterial, antiseptic and/or anti-fungal qualities, **may lull consumers into thinking that the use of such dentifrices may be a sustainable way to prevent or possibly even treat periodontal disease**, over and above whatever claims they are inclined to believe. Such persuasion of consumers, many of whom may have established oral and dental disease, is considered to be **opportunistic marketing, with little regard to the consequences of the exploitation**."[104]

116.    For example, the over-marketing of charcoal dentifrices can cause customers to abandon fluoride toothpastes for fluoride-free varieties, believing in purported oral health properties that do not exist. The authors of the 2019 BDJ article noted the "concerning [. . .]

---

[103]    Plaintiffs do not allege that the fluoride was, in fact rendered inert, nor do they assert it as the specific basis for the claims or damages alleged herein; however, these finding concerning the averse effect of charcoal on fluoride are discussed and raised herein in the context of the larger marketing scheme, not as essential basis for recovery by consumers of the Fluoride Charcoal Toothpastes.
[104]    *Id.*

potential for individuals changing from the use of a regular fluoride-containing toothpaste to the use of a charcoal toothpaste which contains no fluoride, thereby increasing their risk of caries."[105] The authors of the 2017 JADA article also raised this concern, and advised that dentists should "educate their patients about the **unproven claims of oral benefits and possible health risks associated with the use of charcoal dentifrices and the potential increased risk of developing caries with the use of these nonfluoridated . . . products**."[106]

117.    This same phenomena (of abandoning other tried and true toothpastes for the untested Charcoal Toothpastes) extends beyond just fluoride. Hello promises multiple oral hygiene benefits from regular use of the Charcoal Toothpastes (for example, the ingredients list on the product states that charcoal "whitens, polishes and cleans teeth/freshens breath"), and assigns unrealistic functions to the charcoal ingredient, while leaving out other ingredients known to serve said function(s).

118.    Charcoal and its adsorptive properties do not play a role in freshening breath. The 2019 BJD article states:

> Given the adsorption capabilities of activated charcoal, which make it an antidote to acute poisoning and drug overdose, it could be assumed that it would be good constituent of a dentifrice for adsorbing the substances responsible for halitosis. Brushing with a charcoal-based dentifrice may leave the mouth feeling fresh, but such mouth freshness, possibly tempered by an earthy aftertaste of charcoal, may be short-lived, as charcoal does not counter the causes of halitosis. Furthermore, the adsorptive nature of charcoal in the dentifrices may limit the effects of flavourings, essential oils and any other constituents included in the formulation to mask mouth odour, thus limiting the effects of the dentifrices on halitosis.[107]

119.    Hello attributes other attributes to charcoal, with various claims such as "kicking plaque to the curb" and other claims vaguely going to the functionality and adsorptive properties

---

[105]    Linda H. Greenwall et al., "Charcoal-Containing Dentifrices," 226 *British Dental Journal* 697, (2019).
[106]    *Id*. (emphasis added).
[107]    *Id*.

of charcoal. Hello's replacement of tested ingredients with the untested ingredient of charcoal is particularly ill-advised in light of the fact that the assumed premise of charcoal's purported mode of action is not only untested and unsubstantiated, it is considered by many experts to be simply nonsensical: i.e., that the activated charcoal *binds* to surface stain deposits, tannins, plaque, bacteria, odors, and any other noxious or undesirable element, then *adsorbs* such elements into the porous charcoal particle and is brushed away, leaving clean and polished teeth, a detoxified mouth, and fresh breath.

**F.**   **Hello Knew or Should Have Known its Material Claims and Omissions on Whitening Effects, Detoxifying/Adsorptive Properties, Oral Hygiene Benefits and Safety were Misleading, Deceptive and/or False**

120.   Hello's Charcoal Products are subject to a federal legal and regulatory framework concerning the marketing, advertising, branding, and labeling of drugs and cosmetics. (Toothpastes and other dentifrice are classified as cosmetics, drugs, or a combination thereof.)  As a purveyor of regulated oral care products, making various claims as to safety, oral health, cosmetic effects, and even some medicinal and disease-prevention claims, Hello knew or should have known of its duties under such regulations. Indeed, as previously discussed, Hello has undergone the rigorous process to obtain an ADA Seal on some of its products (but has not done so for any of its charcoal products). Many of Defendant's misleading and deceptive practices as to the Charcoal Toothpastes were prohibited by federal and state regulations, of which Hello was certainly aware.

121.   The Federal Trade Commission Act (15 U.S.C. § 41 *et seq.*) ("FTC Act"), as well as the Federal Food, Drug and Cosmetic Act (21 U.S.C. §321 *et seq.*) ("FD&C Act"), the Fair Packaging and Labeling Act (15 U.S.C. §1451 *et seq.*) ("FP&L Act") and the regulatory frameworks and rules created thereunder impose obligations on marketers and distributors such as

Hello. These federal laws were created in the aim to protect consumers from unfair and deceptive practices (including unsafe or deceptively labeled or packaged products), as well as to protect against unfair competition. Similarly, multiple state laws have statutes that incorporate and/or mirror pertinent portions of federal regulatory framework.

122.    In this pleading, Plaintiffs acknowledge Hello's obligations and duties under this federal framework under federal and parallel state frameworks for purposes related to the elements of the common law and state statutory causes of action asserted herein (such as the existence of various legal duties and obligatory standards of care, the existence of a special relationship, as well as to underscore that Hello knew or should have known of its noncompliance and that its conduct was wrongful). Plaintiffs expressly disclaim any attempt to hold Hello to a higher standard than that which is required under federal law, and does not seek relief or remedy for conduct to a standard exceeding that which is required under federal law.[108]

123.    Likewise, the allegations herein as to the Fluoride Charcoal Products do not purport to improperly assert a private right action for any purported violation of the FDA's Anticaries Monograph or other otherwise seek to compel compliance with federal rules or regulations whose enforcement is in the province of a federal agency.[109]

---

[108]    The allegations concerning conduct that violates the FD&C Act, the FTC Act, regulations thereunder, and/or other parallel state laws and regulations, as raised herein, are properly asserted in the context of the causes of action and relief sought herein, and are not barred by preemption. *See, e.g., Reid v. GMC Skin Care USA Inc.,* No. 15-CV-277, 2016 WL 403497, *10 (N.D.N.Y. Jan. 15, 2016) ("Plaintiffs' claims, if proven to be true, would simply require Defendant to truthfully state the efficacy of its products or not sell its products; such relief would not impose a state requirement that is different from or in addition to, or that is otherwise not identical with that of the FDCA.").
[109]    "There is nothing in the [Anticaries Monograph] regarding whitening toothpastes or products." *Canale v. Colgate-Palmolive Co.,* 258 F.Supp.3d 312, 321 (S.D.N.Y. 2017). "The final Anticaries Monograph approves only certain claims regarding decay prevention in dental hygiene products with certain active ingredients for certain intended uses. That a toothpaste contains sodium fluoride, an active ingredient approved under the monograph, and therefore may advertise its cavity-preventing qualities, does not, for example, permit its manufacturer to make misleading claims about the toothpaste's ability to clear acne. If [. . .] *Bowling* were taken literally and out of context, a manufacturer could make such a claim, and then point to the Anticaries Monograph to immunize it against state law claims challenging that assertion. Congress cannot have intended such sweeping preemption." *Canale v. Colgate-Palmolive Co.,* 258 F.Supp.3d 312, 323 (S.D.N.Y. 2017), citing *Bowling v. Johnson & Johnson,* 65 F.Supp.3d 371, 375-76 (S.D.N.Y. 2014); *In re PepsiCo, Inc.,* 588 F.Supp.2d 527, 538-39, n. 10 (S.D.N.Y. 2008).

124.    The Fluoride-Free Charcoal Products are a "cosmetic" and the Fluoride Charcoal Products are both a "cosmetic" and a "drug," qualifying as a drug/cosmetic combination.[110] As such, the cosmetic regulations and discussion below are applicable to the Fluoride Charcoal Toothpastes as well as the Fluoride-Free Charcoal Toothpastes.[111]

**The FTC Act and FTC regulations**

125.    Section 5 of the FTC Act broadly prohibits unfair and deceptive trade practices (15 U.S.C. § 45), and Section 12 of the FTC Act prohibits the dissemination of false and misleading advertisement of food, drugs, and cosmetics (15 U.S.C. §§ 52).[112]

126.    The FTC requires advertisers to possess a reasonable basis for their advertising and marketing claims.[113]  Claims concerning health and safety must be supported by competent and reliable scientific evidence.

127.    The FTC requires that an advertiser substantiate its claims (express and implied) *before* it disseminates said claims, and, when an advertiser actually conveys to a consumer

---

[110]    Section 509 of the FD&C Act provides that the categories of "drug" and "cosmetic" are not mutually exclusive.

[111]    The FDA labeling requirements for over-the-counter (OTC) anticaries drug products, such as the Fluoride Charcoal Toothpastes, can be quite specific, but are also generally prohibitive of misbranding that might mislead the consumer. See, e.g., 21 CFR 355.50 (Labeling of anticaries drug products) and 21 CFR 330.1 (General conditions for general recognition as safe, effective and not misbranded). While not purporting to provide an exhaustive list of Hello's obligations as to an OTC anticaries drug, or a detailed analysis of compliancy – and Plaintiffs do not make any such violation or enforcement thereof the basis of their claims alleged herein – Plaintiffs would note that Hello *was* required to assess whether charcoal (as an 'inactive' non-drug ingredient) interfered with the effectiveness of the fluoride (the 'active' drug ingredient). Under 21 CFR 330.1, a product will not be considered safe and effective, and will be subject to regulatory action, if it fails to conform with the requirement that "(e) [t]he product contains only suitable inactive ingredients which are safe in the amounts administered and do not interfere with the effectiveness of the preparation or with suitable tests or assays to determine if the product meets its professed standards of identity, strength, quality, and purity." 21 CFR 330.1(e).

[112]    For purposes of Section 12 of the FTC Act, classification as a "drug" or "cosmetic" is based on the definitions at Section 15 (c) and (e) of the FTC Act, 15 U.S.C. § 55(c), (e).

[113]    The FTC requires companies to "have a reasonable basis for advertising claims before they are disseminated, and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act. . . ." *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *In the Matter of Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir. 1986).

(expressly or impliedly) that it has certain level of support or evidence for its products, it must have such substantiation *to the actual level* it claims to possess.

**The FD&C Act and FDA regulations**

128.     The FD&C Act prohibits the marketing and movement in interstate commerce of adulterated or misbranded food, drugs and cosmetics. 21 U.S.C. § 321 *et seq*. FD&C Act defines "drug" and "cosmetic" at 21 USC §321(g)(1) and 21 USC §321(i), respectively.

129.     The FD&C Act (21 U.S.C. § 321 *et seq*.) prohibits the marketing and movement in interstate commerce of adulterated or misbranded food, drugs and cosmetics.[114]

130.     The FD&C Act provides that a drug or a cosmetic will be considered misbranded for numerous potential reasons, including if the drug or cosmetic's "[] labeling is false or misleading in any particular." 21 U.S.C. § 352(a) (misbranded drugs[115]); 21 U.S.C. § 362(a) (misbranded cosmetics). Labeling will be deemed misleading not only because a label statement is deceptive in its representations, and also when a material fact is not revealed on a label. As to the latter, labeling is deemed misleading if it fails to reveal facts that are material in light of other representations, or material with respect to the consequences resulting from the intended use of the product. 21 CFR 1.21 (Failure to reveal material facts).

131.     A cosmetic is also considered misbranded if its safety has not been adequately substantiated, and it does not conspicuously bear the statement: "**Warning – The safety of this product has not been determined.**" 21 CFR 740.10. The safety of a cosmetic may be considered adequately substantiated if experts qualified by scientific training and experience can reasonably

---

[114]     The FD&C Act defines "drug" and "cosmetic" at 21 USC §321(g)(1) and 21 USC §321(i), respectively. The Charcoal Toothpowders at issue qualify as cosmetics, as they are fluoride-free and are intended to be applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance.

[115]     The FDA labeling requirements for over-the-counter (OTC) anticaries drug products, for example, are specific and numerous, as well as generally prohibitive of misbranding that might mislead the consumer. See, e.g., 21 CFR 355.50 (Labeling of anticaries drug products) and 21 CFR 330.1 (General conditions for general recognition as safe, effective and not misbranded).

conclude from the available toxicological and other test data, chemical composition, and other pertinent information that the product is not injurious to consumers under conditions of customary use and reasonably foreseeable conditions of misuse.[116]

132.    As a company engaged in the interstate marketing, distribution and sale of its Charcoal Toothpastes, Hello was or should have been aware of its legal duties under these laws, as well as the regulatory framework built thereunder. Hello's legal duties include but are not limited to: (i) to ensure the safety of the Charcoal Toothpastes; (ii) to disclose risks of use and safety hazards; (iii) to ensure the advertising claims and the label and packaging of the Charcoal Toothpastes are not misleading or deceptive in their claims and omissions; (iv) to possess adequate and credible substantiation for its claims; and (v) to disclose the lack of substantiation, particularly for safety.

133.    Defendant Hello was, or should have been, aware of its obligations under the above-described legal and regulatory framework, yet appears to have disregarded its duties as to claim substantiation, safety, marketing and advertising, as well as to product packaging and labeling. This further underscores that it knew or should have known its acts and practices were also unlawful under state consumer protection laws.

134.    Defendant Hello knew or should have known that it did not possess the legally required substantiation for its claims.[117]

135.    Defendant Hello also knew, or should have known, that the Charcoal Toothpastes did not possess the promised benefits and safety, and that there was risk of harm. Scientific studies

---

[116]      *See, e.g.*, FDA Cosmetic Labeling Guide, https://www.fda.gov/cosmetics/cosmetics-labeling-regulations/cosmetics-labeling-guide.

[117]      The FTC requires companies to "have a reasonable basis for advertising claims before they are disseminated, and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act. . . ." *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *In the Matter of Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir. 1986).

and journals that contradicted many of Hello's claims were published and available to Hello at the time it disseminated its claims and marketing content.

136.    Moreover, Hello would not have even had to look to academic or scientific resources, because the scientific findings were also reported in consumer reports and mainstream media outlets during the time the Charcoal Toothpastes were developed, marketed and sold. Examples include:

- ABC News, June 2017, *How Safe is Activated Charcoal?* reports concerns of Dr. Upen Patel, D.D.S., because charcoal dentifrices are not evaluated by the ADA for long term use, can erode enamel, abrasiveness, gums, and tissue, and the small charcoal particles "can get stuck in your gums and in small cracks in your teeth, so you can have these little black lines in your gums and your teeth you can't get out."[118]

- Prevention.com, September 2018, *Is Charcoal Toothpaste the Answer to Whiter Teeth?,* quoted Dr. Kenneth Magid, D.D.S., adjunct clinical associate professor at NYU College of Dentistry: "Not only do charcoal toothpastes not meet the criteria that I would use to recommend them, but they may be too abrasive and damaging to teeth." "Since charcoal toothpastes aren't regulated by any agency or approved by the ADA, many of the products may be too abrasive for regular use and can possibly remove the enamel outside of the teeth or damage porcelain restorations such as veneers or crowns." "Once the enamel wears away, there's no way to regrow it, and on top of that, it can actually make your teeth look duller and darker instead of brighter. This is due to the underlying dentin showing through. . . . In addition to darkening your smile, wearing down your enamel will also make your teeth more sensitive to temperature and prone to cavities."[119]

- BBC, May 2019, *Charcoal Toothpastes 'don't whiten teeth,'* cited the British Dental Journal for the premise that "charcoal-based toothpastes, which claim to whiten teeth, are a 'marketing gimmick' which could increase the risk of tooth decay," and are "more abrasive than regular toothpastes, potentially posing a risk to the enamel and gums." The article quoted Dr. Greenwall-Cohen as stating that charcoal particles in toothpastes can "get caught up in the gums and irritate them," and also be problematic for fillings.[120]

---

[118]    Irene Cruz, "How Safe Is Activated Charcoal?," ABC 10 (June 9, 2017) [https://www.abc10.com/article/news/local/how-safe-is-activated-charcoal/447456019].
[119]    Macaela Mackenzie, "Is Charcoal Toothpaste the Answer to Whiter Teeth?," Prevention (Sept. 26, 2018) [https://www.prevention.com/beauty/a23470865/charcoal-toothpaste/].
[120]    "Charcoal Toothpastes 'don't whiten teeth,'" BBC: Health, May 10, 2019 [https://www.bbc.com/news/health-48216116].

- Harper's Bazaar, August 2018, *Is Charcoal Toothpaste Safe to Use*? (re-published in July 2019), reported on the doubts and issues raised by the British Dental Journal, noting, "[u]nlike your liver and kidneys, the teeth and gums don't perform a detoxifying function of the body, and since so-called toxins aren't generally hanging out in your mouth anyway, there's not much point in using your tooth cleaning to purge them."[121]

- DailyMail, May 2019, *Charcoal-based Toothpastes do NOT whiten teeth and may lead to tooth decay as dentists warn the products are reliant on 'marketing gimmicks and folklor*e, quotes Professor Damien Walmsley, scientific adviser for the British Dental Association: "Charcoal-based toothpastes offer no silver bullets for anyone seeking a perfect smile, and come with real risks attached." "These abrasive formulations may be effective at removing surface stains, but prolonged use may also wear away tooth enamel. Research now shows it could even cause discoloration of the gums."[122]

- Dr. Ada Cooper, DDS, spokesperson for the American Dental Association, warned of charcoal toothpastes in *Beware Whitening Promise of Charcoal Toothpastes* in March 2019: "Just because something is popular doesn't mean it's safe." "Charcoal is recognized as an abrasive material to teeth and gums." "Using materials that are too abrasive can actually make your teeth look more yellow, because it can wear away the tooth's enamel and expose the softer, yellower layer called dentin."[123]

137.    It is entirely implausible that Defendant Hello, a major oral care company that possessed particularly sophisticated marketing savvy and invested significant time, money and effort into the marketing of its products, failed to notice reported concerns from the ADA and other dental professionals and experts, researchers within the scientific community, and the media that the safety and efficacy of charcoal dentifrices were wholly unsubstantiated, and their use was highly risky to consumers' oral health, dental hygiene and aesthetics. (Unlike consumers, whose

---

[121]     Lauren Hubbard & Alexandra Tunell, "Is Charcoal Toothpaste Safe to Use?," Harper's Bazaar, Aug. 14, 2018 (updated: Harper's Bazaar Staff, "Is Charcoal Toothpaste Safe to Use?," July 31, 2019) [https://www.harpersbazaar.com/beauty/health/advice/a3764/charcoal-toothpaste-pros-cons/].
[122]     Victoria Allen, "Charcoal-based Toothpastes do NOT whiten teeth and may lead to tooth decay as dentists warn the products are reliant on 'marketing gimmicks and folklore," DailyMail (May 9, 2019), [https://www.dailymail.co.uk/health/article-7010219/Charcoal-based-toothpastes-NOT-whiten-teeth.html].
[123]     The Family Dental Center, Mar. 2019, "Beware Whitening Promise of Charcoal Toothpastes," [https://thefamilydentalcenter.com/blog/beware-whitening-promise-of-charcoal-toothpastes/].

attention to the claims of the oral care industry will likely be limited to time in a shopping aisle looking at product packaging, or at online retail sites that present a company's marketing claims.)

138.   Hello's awareness that its claims were scientifically or medically unsubstantiated can also, arguably, be inferred from what it does *not* say in its website FAQs. For example, to the posited question, "are hello products safe?" Hello answers:

> "a resounding YES. safety and efficacy are of the utmost importance to us. . . . for a majority of our fluoride offerings, we've done third party testing that demonstrated our pastes are effective at removing stains while being gentle on your teeth. these tests are called PCRs (pellicle cleaning ratios) and RDAs (relative dentin abrasivity) . . . ."[124]

Note what is not said—Hello does not say that it has done third-party testing of its Charcoal Toothpastes.[125]

139.   Red flags were also raised by Defendant's own customers. Verified Hello Charcoal Toothpastes consumers have raised concerns online for years – citing problems that comport with those identified in dentistry studies and other reports. In a review dated September 8, 2018, Amazon user "Jen" reported the following after using the "hello fluoride-free whitening toothpaste": "It makes my teeth hurt & it's making my enamel thin and my gums purple."[126]

140.   These online reports mimic the same phenomenon reported in dentistry journals and publications (going as far back to a 1932 JADA report),[127] and should cause any responsible oral care business to seriously evaluate the safety and effectiveness of its product. Indeed, Hello

---

[124]   "safety & allergens," Frequently Asked Questions, Hello-Products.com, https://www.hello-products.com/faq/#safety%20&%20allergens (last accessed June 25, 2019).

[125]   "We observed that activated charcoal was more abrasive than a whitening toothpaste on acrylic resins. . . ." Brantley McCarthy et al., "Activated Charcoal as a Whitening Dentifrice," Academy of General Dentistry 2015 Annual Meeting (June 18-21, 2015) [https://www.epostersonline.com/agd2015/node/72].

[126]   Customer Review, AMAZON.COM (September 8, 2018), https://www.amazon.com/gp/customer-reviews/R3LT1KJSKLHL93/

[127]   John K. Brooks et al., "Commentaries: More on Charcoal and Charcoal-Based Dentifrices," 148 *JADA* 785 (2017), [http://dx.doi.org/10.1016/j.adaj.2017.09.027] (quoting S.M. Gordan, "Kramer's Original Charcoal Dental Cream: not acceptable for A.D.R.," 33 *JADA* 912, 912–13 (1946)).

was under a continuing duty to warn if its product poses a risk, and its duty could be triggered by new information.

G.     **Hello Intended Consumers' Reliance and Induced Consumers' Purchase of the Charcoal Toothpastes**

141.    Hello's advertising and marketing scheme was constructed in order to induce consumers to purchase the Charcoal Toothpastes over other products, and to do so at a price premium.

142.    The claims at issue – which are alleged herein as misleading, inaccurate, and/or false, as well as lacking a proper factual basis and required evidentiary substantiation – are material to a consumer's decision whether to purchase them. Hello negligently, recklessly and/or intentionally fails to disclose material information that, if known to a consumer, would inform their perception of the claims affirmatively made, and would affect the purchase decision. The misrepresentations and omissions also have potentially serious consequences on consumers' oral health and dental hygiene, simply as a result of the intended use.

143.    Hello sought to instill consumer trust and confidence with terms like "thoughtfully formulated," and "naturally friendly," and claims of "being on a mission." Hello presented a research scientist for her expertise in oral health care, and even directed consumers to the website on the printed product packaging to "learn more." Hello made many claims relating to health, safety and oral aesthetics, which it knew average consumers were unequipped to assess, and were relying on and placing their trust in. Hello persistently claimed superiority over other brands in terms of quality and safety of ingredients, and conscientious 'friendliness.'

144.     Hello charges more for its Charcoal Toothpastes than it does for Hello's other non-charcoal toothpastes. On its website, Hello charges $4.99 per 4-ounce tube of non-charcoal toothpaste. The Charcoal Toothpastes are sold at $5.99 and $6.99 per 4-ounce tube.[128]

145.     Hello negligently continues to promote and hype the (unsubstantiated) attributes of activated charcoal, and highlighting positive press coverage, "as featured in Glamour, Brit + Co, teenVogue."[129] It does so despite warnings from dentists and the scientific community about charcoal dentifrices – at best a "marketing gimmick" and, at worst, harmful to teeth, dentistry implants and overall oral health.

146.     Hello's misleading claims, material omissions, and its false and deceptive marketing campaign as a whole, are materially misleading and likely to deceive (and have deceived) consumers, and are intended to induce reliance and the purchase of one or more of the Charcoal Toothpastes.

### J.     Consumers' Reliance was Reasonable and Justified

147.     Each and every purchaser of the Hello Charcoal Toothpastes, including the named Plaintiffs and putative Class members, were exposed to Defendant's claims. In addition to online and print marketing and ads, the claims are printed on external cardboard packaging and product labeling.

148.     Hello's ubiquitous messaging that it is "thoughtful," "naturally friendly," "free of harmful ingredients," and other stylistic branding flourishes together foster a reasonable expectation that Hello is a trustworthy brand, that its claims were legitimate, and that the products were safe and effective, with "a resounding YES!".

---

[128]     Charcoal Toothpaste, Hello Products, https://www.hello-products.com/shop/toothpaste/ (last accessed Sept. 10, 2019).
[129]     Hello Products, https://www.hello-products.com (last accessed Sept. 10, 2019).

149.    Consumers reasonably relied on the oft-repeated claims that the Charcoal Toothpastes had natural and safe whitening and detoxifying properties, as well as other dental hygiene and cosmetic benefits, that they were safe for everyday use, as well as generally effective, appropriate, and adequate for dental hygiene maintenance and, at least not harmful in their intended use.

150.    An average consumer lacked any reasonable or meaningful ability to test or practicably verify Hello's claims. Consumers cannot reasonably be expected to research and independently ascertain the truthfulness of the claims made by the sellers they pay for products.

151.    This is particularly so in the purchase of a dental product from an oral care company, and consumers may reasonably rely upon the expertise of an oral care company that introduces a dental product to the retail market and presents it as safe for long-term daily use, effective and adequate to meet dental hygiene and oral care maintenance needs. Reasonable typical consumers lack sufficient training to discern the validity of such claims, which require a certain level of expertise and specialized knowledge; nor should consumers be reasonably expected to feel the need to question or investigate these types of claims.

152.    In this instance, Hello went out of its way with bombastic marketing and invited consumers to visit its website, to read its long explanations of the attributes of activated charcoal, to explore its hashtags, and to generally engage with – and place trust and confidence in – the brand and its products. Consumers' justifiable reliance is inextricably wound up in Hello's marketing, which was substantial in content and volume, and persistently underscoring its 'friendly' and engaging branding in order to influence consumer perceptions and cultivate trust and confidence.

153.    Consumers relied on Hello's claims and were induced to believe that the Hello Charcoal Toothpastes provide properties, qualities and safety benefits that other 'retail' toothpastes do not, and also that other 'natural' toothpastes do not. Unfortunately they paid a price, in economic injury as well as potential non-economic consequences.

### K.    Hello's Wrongful Conduct Injured Consumers

154.    The named Plaintiffs, putative Class members, and consumers at large have been harmed by Hello's false, misleading and negligent representations because they purchased the Hello Charcoal Toothpastes that were not as represented, in that they did not provide the promised benefits, properties, and characteristics, as well as a level of safety. They were also ineffective as dentifrice and/or harmful.

155.    Plaintiffs and purported Class members paid a premium price for the mislabeled and falsely advertised products, and such premium can be directly and clearly tied to the inclusion of the activated charcoal ingredient, and the hyped marketing claims Hello made about its attributes. The premium would not have been paid but-for Hello's misrepresentations on the unproven and potentially harmful ingredient - charcoal. [130]

156.    Hello's misrepresentations and omissions concerned material characteristics of its products, and it charged a higher price for such characteristics. Consumers (including the named Plaintiffs) would not have paid premium prices or even purchased them at all, but-for the representations on the attributes of activated charcoal and the benefits of its products could naturally and safely deliver. Hello's claims and omissions were materially misleading, in that they

---

[130]    Each consumer has been exposed to the same or substantially similar misleading and unlawful practices and each product contains identical or substantially similar claims, and each of the Charcoal Toothpastes were sold at a price premium. As such, each consumer suffered the same or substantially similar injuries as the named Plaintiffs, irrespective of which particular Charcoal Toothpaste they purchased.

are likely to deceive a reasonable consumer and also directly concern unique and intrinsic qualities of the products, and caused an increase in consumers' perception of their value.

157.    Moreover, had Hello been revealed that charcoal in dentifrice is highly abrasive, carries significant risks, and/or even that Hello lacked the substantiation it was legally required to possess for its claims, then reasonable consumers, who had been drawn in by Hello's friendly marketing tactics, would have had cause to refrain from purchasing as well as using the Charcoal Toothpastes. In light of Hello's marketing content, even were the charcoal ingredient as implemented in Hello's particular formula for its Charcoal Toothpastes not ultimately proven to be categorically unsafe, the lack of substantiation and potential for risk would have deterred a reasonable consumer purchasing (at a premium) what they reasonably believed to be very safe healthy, natural, free of any potentially harmful ingredients.

158.    These products were not as represented and cannot deliver the promised health, dental hygiene, and cosmetic benefits, as previously discussed. For example, the Hello had no reasonable factual basis for claiming any oral health benefits delivered in the form of purported detoxifying, purifying and adsorption properties of charcoal. The promised performance and benefits simply were not, and could not have been, realized.

159.    The Charcoal Toothpastes were sold at a price premium of $1 to $2 per tube for a toothpaste with the unproven, potentially harmful ingredient, over the toothpastes sold by Hello that do not contain charcoal.

160.    In addition to the economic injury in the form of a price premium paid for falsely promised benefits, consumers have been damaged by the total purchase price, because they purchased a dentifrice that does not provide the basic safety and oral health maintenance that otherwise similar non-charcoal dentifrices do.

161.    Hello claims that it has tested and verified the effectiveness and safety of its non-charcoal whitening toothpastes, but notably, it makes no such claim for the Charcoal Toothpastes. Moreover, Hello's non-charcoal toothpastes (sold at $3.99-$4.99) contain some ingredients that are not present in the Charcoal Toothpastes, but that are commonly accepted as safe and effective in dentifrice (calcium carbonate, a common abrasive agent, is an example). Because charcoal powder is unproven as safe and effective for use in dentifrice (and potentially harmful), it is not an appropriate substitute for many such ingredients.

162.    As such, the consumer is harmed in a second way that is distinct from, and in addition to, the $1 to $2 price premium paid for nonexistent benefits of activated charcoal. Not only do Hello's Charcoal Toothpastes not bring an additional benefit for the $1 to $2 premium (in the form of purported detox or natural whitening), they also may not provide basic oral hygiene maintenance that would have been provided by other non-charcoal, regular toothpastes containing ingredients that have been substantiated, proven, and/or approved as legitimately safe and effective. Instead, Plaintiffs and putative Class members were using oral care products that were deficient and do not meet basic oral health care needs and maintenance.

163.    Furthermore, the use of the products carried significant risk due to the inclusion of charcoal.[131]

164.    Consumers were damaged by the entire cost of a tube of toothpaste that was ineffective at maintenance of oral hygiene and potentially deleterious to oral health.

---

[131]    For example, they used the Charcoal Toothpowders (which had been represented as, inter alia, safe for gums, natural, healthy and effective for whitening, and non-abrasive to enamel) which were, unbeknownst to them, in fact abrading their enamel rather than safely and naturally whitening their teeth. And, as previously discussed, the inclusion of charcoal particles can directly damage dental implants or the gumline. Charcoal also causes damage that arrives in the form of oral health issues that can arise due to failure to meet basic oral health care needs and maintenance, as well as oral health issues that can spiral as consequences of the abrasive damage caused by charcoal.

165.    In addition to its trusting consumers, Hello took unfair advantage of its competitors. It conveyed that the Charcoal Toothpastes were of such premium, superior quality and had attributes that other commercially available toothpowders do not (whether 'natural' or more typical toothpowders).

166.    Hello has collected substantial profits as a result of numerous material omissions and false and misleading claims over the benefits and safety of activated charcoal in dentifrice and the Charcoal Toothpastes, and other purported attributes that were false and misleading.

167.    In 2018, Hello CEO Craig Dubitsky estimated that Hello's revenue would exceed $20 million.[132] It reports that its toothpaste, "hello activated charcoal fluoride-free whitening toothpaste" is the "#1 selling charcoal toothpaste in FDM (source: IRI MULO L52 weeks 3.24.19)."[133]

168.    Defendant had knowledge that its claims lack required substantiation and that the Charcoal Toothpastes do not comport with the representations it has made. It also knew or should have known of the potential for serious harm caused by the use of charcoal in dentifrice. Defendant's conduct is deceptive, unethical, in violation of public policy, wanton and recklessly indifferent to others, and substantially injurious to consumers as well as to competitors.

169.    Defendant should not be permitted to retain its substantial benefit obtained from its injurious misconduct, which in justice and equity belong to Plaintiffs and members of the Class, and caused them injury; nor should it, in justice and equity, be permitted to continue to benefit from its unfair and deceptive practices.

---

[132]    Amy Feldman, "Taking on the Toothpaste Giants: How One Entrepreneur Built a Fresh $20 Million Brand," Forbes, Mar. 29, 2018, [https://www.forbes.com/sites/amyfeldman/2018/03/29/taking-on-the-toothpaste-giants-how-one-entrepreneur-built-a-fresh-20-million-brand/#4ba7c73c4019] (last accessed June 20, 2019).
[133]    Reported at the bottom of all hello-products.com pages, https://www.hello-products.com/ (last accessed September 17, 2019).

170.   Without remedy (including injunctive relief), Plaintiffs, members of the putative Class, and other consumers, will suffer a concrete harm, in that they cannot be confident that the labeling of products will be truthful and not misleading when they are making their purchase decisions in the future. Alternatively, they might mistakenly but reasonably believe that the labeling and advertising of the products has been substantiated and/or corrected, and be deceived yet again into purchasing one or more of the products.

## V.   CLASS ACTION ALLEGATIONS

171.   Pursuant to CAFA and the Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this lawsuit as a Class Action on behalf of themselves and all other similarly situated members of the classes, as defined below. This Class Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

The proposed "**Nationwide Class**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[134] for personal, family or household use within the United States within the applicable statute of limitations.

The proposed "**AZ Subclass**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[135] for personal, family or household use within the state of Arizona within the applicable statute of limitations.

The proposed "**CA Subclass**" is defined, subject to timely amendment following discovery, as follows:

---

[134]   As previously defined herein.
[135]   As previously defined herein.

All individuals who purchased one or more of Hello's Charcoal Products[136] for personal, family or household use within the state of California within the applicable statute of limitations.

The proposed "**CO Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[137] for personal, family or household use within the state of Colorado within the applicable statute of limitations.

The proposed "**FL Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[138] for personal, family or household use within the state of Florida within the applicable statute of limitations.

The proposed "**IL Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[139] for personal, family or household use within the state of Illinois within the applicable statute of limitations.

The proposed "**MA Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[140] for personal, family or household use within the Commonwealth of Massachusetts within the applicable statute of limitations.

The proposed "**MI Subclass**" is defined, subject to timely amendment following discovery, as follows:

---

[136] As previously defined herein.
[137] As previously defined herein.
[138] As previously defined herein.
[139] As previously defined herein.
[140] As previously defined herein.

> All individuals who purchased one or more of Hello's Charcoal Products[141] for personal, family or household use within the state of Michigan within the applicable statute of limitations.

The proposed "**MO Subclass**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[142] for personal, family or household use within the state of Missouri within the applicable statute of limitations.

The proposed "**NJ Subclass**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[143] for personal, family or household use within the state of New Jersey within the applicable statute of limitations.

The proposed "**NC Subclass**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[144] for personal, family or household use within the state of North Carolina within the applicable statute of limitations.

The proposed "**NY Subclass**" is defined, subject to timely amendment following discovery, as follows:

> All individuals who purchased one or more of Hello's Charcoal Products[145] for personal, family or household use within the state of New York within the applicable statute of limitations.

The proposed "**SC Subclass**" is defined, subject to timely amendment following discovery, as follows:

---

[141] As previously defined herein.
[142] As previously defined herein.
[143] As previously defined herein.
[144] As previously defined herein.
[145] As previously defined herein.

All individuals who purchased one or more of Hello's Charcoal Products[146] for personal, family or household use within the state of South Carolina within the applicable statute of limitations.

The proposed "**TX Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[147] for personal, family or household use within the state of Texas within the applicable statute of limitations.

The proposed "**WI Subclass**" is defined, subject to timely amendment following discovery, as follows:

All individuals who purchased one or more of Hello's Charcoal Products[148] for personal, family or household use within the state of Wisconsin within the applicable statute of limitations.

172.   Members of the proposed Class and Subclasses (and any other alternative subclasses that may be proposed) are collectively referred to herein as the "Class members."

173.   Excluded from the Class are: (1) Defendant and its subsidiaries, affiliates, employees, officers, directors, assigns, and successors, as well as any entities or divisions in which any of the Defendants have a controlling interest; (2) the Judge and/or Magistrate Judge to whom this case is assigned and any member of the Judges' immediate families; and (3) anyone asserting claims for personal injury in connection with the Hello Charcoal Products. Plaintiffs reserve the right to amend the definition of the Class if discovery and/or further investigation reveal that the Class should be expanded or otherwise modified.

174.   **Numerosity**: The exact number of Class members is presently unknown, and can only be ascertained through appropriate discovery. However, Plaintiffs reasonably estimate that

---

[146]   As previously defined herein.
[147]   As previously defined herein.
[148]   As previously defined herein.

the Nationwide Class consist of thousands or tens of thousands of members. The expected numerosity of the Class is such that joinder of all members is impracticable. Moreover, the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court, including in terms of practicability and manageability. The Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

175.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of each of the Classes and predominate over questions affecting only individual members. Defendant engaged in a common course of conduct giving rise to the legal claims as to Plaintiffs themselves as well as to the other putative members of the Classes, all of whom were damaged by the identical common law violations, statutory violations (within each Subclass) business practices, and misconduct. For example, consumers were exposed to the same or substantially similar set of misrepresentations and omissions and packaging, labeling, and marketing; manifested a similar kind and degree of reliance; and also suffered substantially similar injuries. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

176.    These common questions predominate over any questions affecting only individual members of the Classes and include, but are not limited to, the following:

a.    Whether, in its product packaging, labeling, marketing, advertising, and/or sale of the Charcoal Products, Defendant made materially misleading representations and material omissions;

b.    Whether Defendant made and breached an express warranty to the named Plaintiffs and the Class;

c.    Whether Hello's false and misleading statements concerning the Charcoal Products and their concealment of material facts concerning the Charcoal Products were likely to deceive reasonable consumers;

d.      Whether Plaintiffs and the Class members suffered an ascertainable loss or actual injury;

e.      Whether misrepresentations related to or printed on the packaging of the Charcoal Products caused Plaintiffs and the Class members to pay a higher price than they otherwise would;

f.      Whether the acts and omissions of Defendant violated the enumerated state consumer protection statutes and/or deceptive acts and practices statutes in effect in the various States;

g.      Whether Plaintiffs and the Class members are entitled to injunctive relief; and

h.      Whether the actions of Defendant warrant punitive damages.

177.    **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Classes, as Plaintiffs and all members of the Classes purchased Hello Charcoal Products after exposure to, and reliance upon, the same material misrepresentations and/or omissions reflected in the claims appearing on the product packaging and labeling, on Defendant's websites, Defendant's Amazon.com listing, other online retail platforms, and/or other forms of advertising and marketing. Plaintiffs and Class members have suffered the same or substantially similar injuries as a result, in that they were damaged by the common thread of Defendant's misconduct and incurred expenses based on their reliance thereon.

178.    Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent members of the Classes. As alleged above, each consumer has been exposed to the same or substantially similar deceptive practices regardless of which of the Charcoal Products they purchased because: 1) identical or substantially similar claims are made as to each product regarding the benefits of activated charcoal, and each product was labeled and/or promoted in marketing and advertising with the same or substantially similar claims and omissions; and 2) the inclusion of activated charcoal in each product gives rise to the harms described herein and raises

the same set of concerns. Particularly as to the Non-Fluoride Charcoal Toothpastes, those products are essentially one and the same product, with very trivial variation in ingredients and in the representations made.

179.   **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel highly experienced in prosecuting consumer class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of members of the Classes, and have the resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Classes.

180.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the relatively small size of the claims of the individual members of the respective Classes, absent a class action, most members would likely find the cost of litigating their claims against Defendant to be prohibitive or impractical. A class action, on the other hand, offers the possibility for effective redressability. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the time and resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The class action device presents no management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

181.   **Ascertainability and Notice**: The proposed Classes are each defined with reference to objective criteria. A reliable and administratively feasible mechanism exists for the determination of membership of each of the proposed Classes. Plaintiffs and their counsel anticipate that notice to the proposed Class members will be effectuated through recognized,

Court-approved notice dissemination methods, which may include the United States mail, electronic mail, internet postings, and/or other published notice.

## VI.   CAUSES OF ACTION

### COUNT ONE
### *Nationwide Class*
### Breach of Express Warranty

182.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

183.    Plaintiffs bring this claim under Article 2 of the Uniform Commercial Code (the "UCC") (as adopted and codified under New York UCC law at § 2-313, and other states where members of the Nationwide Class reside) and do so on behalf of themselves and the members of the Class.

184.    Under Section 2-313 of the UCC,  affirmation of fact or promise made by the seller to the buyer, which relate to the goods and are a basis of the bargain, create an express warranty that the goods shall conform to the affirmation or promise.

185.    In connection with the sale of the Charcoal Toothpastes, Defendant issued written express warranties concerning the Charcoal Toothpastes. Express warranties concerning the Charcoal Toothpastes included, but were not limited to:

- "naturally whitening"

- "whitens naturally"

- "epic whitening"

- "noticeably whiter teeth"

- "whitens, polishes and cleans teeth/freshens breath"

- "detoxify your mouth"

- "detoxifies and freshens breath"

- "a natural whitener and detoxifier that helps make smiles brighter and breath fresher"

- "detoxifier that removes surface stains and freshens breath"

- "gentle and safe for everyday use"

- "safe for enamel"

- "prevents cavities"

- "adsorptive"

- "adsorb the odors that cause bad breath and the tannins that can stain teeth"

- "helps prevent cavities and strengthen enamel"

- "removes plaque"

- "kicks plaque to the curb"

186.    Defendant's affirmations of fact or promise were made to the Plaintiffs and members of the Class on the product packaging and labeling of the Charcoal Toothpastes, on Hello's website, and in other online retail sites and digital and print advertising.

187.    These affirmations of fact or promise were material and became part of the basis of the bargain between the Defendant on the one hand, and the Plaintiffs and Class members on the other, thereby creating express warranties that the Charcoal Toothpastes would conform to such affirmations of fact and promise.

188.    Plaintiffs and the Class members were in direct privity with Defendant and/or its agents, or were intended third-party beneficiaries of the warranties breached hereinto the extent required by law.

189.    Plaintiffs and Class members reasonably and justifiably relied on the Defendant's express warranties, believing that the Charcoal Toothpastes they purchased would conform to the express warranties.

190.    Defendant breached its express warranties because the Charcoal Toothpastes do not, in fact, conform to the affirmations of fact or promise, and the Charcoal Toothpastes do not perform as expressly warranted. They did not so perform for Plaintiffs, and they cannot perform.

191.    In fact, no reliable, scientifically sound studies have demonstrated that any of the benefits of activated charcoal or the Charcoal Toothpastes as represented by Defendant to be substantiated, and there is no substantiation of their safety or efficacy. Activated charcoal has never been proven effective and safe for use in dentifrice generally or for the particular claims made by Defendant.

192.    Plaintiffs and the Class members were injured as a direct and proximate result of Defendant's breach because Plaintiffs and the Class members did not receive the benefit of the bargain, as the Charcoal Toothpastes did not have the promised benefits, effectiveness, safety, value or other properties as represented. The Plaintiffs and the Class members suffered injuries because, had they known the true facts, they would not have purchased the Charcoal Toothpastes, as compared to similar products that did conform as warranted and represented.

193.    Within a reasonable time after she knew of Defendant's warranty breaches, Plaintiff Patellos, on behalf of herself and Class members, placed Defendant on notice of its breach and gave it opportunity to cure, with her initial Class Action Complaint filed October 16, 2019 and subsequently sent by registered mail to Defendant's headquarters in New Jersey and received on November 19, 2019.

194.     As a direct and proximate result of Defendant's breaches of express warranty, Plaintiffs and the Class members have been damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold, in an amount to be proven at trial, together with interest thereon from the date of purchase.

**COUNT TWO**
*NY Subclass*
**Deceptive Acts and Practices**
**Violation of New York General Business Law § 349**

195.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

196.     Plaintiffs Briley, Fishon, and Patellos  bring this Count individually on behalf of themselves, and on behalf of the NY Sublass.

197.     Section 349 of the New York General Business Law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state. . ." and further provides that "any person who has been injured of any violation of the [GBL § 349] may bring an action in his own name to enjoying such unlawful act or practice. . ."

198.     By the acts and conduct alleged herein, Defendant Hello committed unfair or deceptive acts and practices, and did so on a recurring basis and in violation of the GBL. These acts and conduct include, but are not limited to, Defendant's deceptive and inaccurate misrepresentations that the Charcoal Toothpastes (i) are safe and gentle enough for everyday use, (ii) are effective for naturally whitening teeth, (iii) de-toxify the mouth, and (iv) have adsorptive properties that freshen breath, lift stains, remove plaque, and provide other benefits.

199.     Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; (ii)

safety had not been evaluated for long-term use, (iii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature and may in fact be detrimental and harmful to oral health and aesthetics.

200.    Defendant also represented the Charcoal Toothpastes to be superior and safer than its competitors, which was directly refuted by a scientific study finding that charcoal pastes were more abrasive on tooth enamel than whitening pastes without charcoal.

201.    The foregoing deceptive acts and practices were likely to deceive or mislead reasonable consumers, and were consumer-oriented so as to induce consumers to purchase the Charcoal Toothpastes.

202.    Defendant's deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the benefits, safety, and characteristics of the Charcoal Toothpastes. They misled Plaintiffs Briley, Fishon, and Patellos  NY Subclass members and other reasonable consumers who acted reasonably under the circumstances, inducing them to purchase the Charcoal Toothpastes, and to do so at a price premium, yet do not receive the full value of their purchase and did not get the benefit of their bargain. A reasonable consumer, including each of the named Plaintiffs, would and did expect that the purchased Charcoal Toothpastes would provide the benefits, meet the quality and safety standards, and otherwise conform to the representations on the product labeling and packaging and on Defendant's website and online advertising and sales listings. Defendant charged a price premium for promised cosmetic, dental hygiene and oral health benefits that had not been substantiated and were not ultimately delivered.

203.    As a result of Defendant's false, misleading, and deceptive statements and representations, including but not limited to the misrepresentations described herein, Plaintiffs Briley, Fishon, and Patellos  and members of the NY Subclass have suffered, and continue to

suffer, economic injury. They were injured because, had they known the true facts (that the Charcoal Toothpastes did not have the represented benefits, safety and characteristics), they would not have purchased the Charcoal Toothpastes and/or would not have paid the price premium Hello charged for the Charcoal Toothpastes, as compared to similar products that did not bear these misrepresentations. Plaintiffs Briley, Fishon, and Patellos and the NY Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

204.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

205.    Pursuant to New York General Business Law § 349, Plaintiffs Briley, Fishon, and Patellos seek an order of this Court enjoining Hello from continuing to engage in unlawful, unfair or fraudulent business practices, or any other conduct prohibited by law. Plaintiffs Briley, Fishon, and Patellos and the NY Subclass members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and deceptive acts and practices of Hello, as described above, present a serious threat to Plaintiffs Briley, Fishon, and Patellos and the NY Subclass members. Plaintiffs thus pray for relief as set forth below.

**COUNT THREE**
*NY Subclass*
**False Advertising**
**Violation of New York General Business Law § 350**

206.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

207.    Plaintiffs Briley, Fishon, and Patellos bring this Count individually on behalf of themselves, and on behalf of the NY Subclass.

208.    By the acts and conduct alleged herein, Hello committed unfair or deceptive acts and practices that constitute violations of Section 350 of the New York General Business Law, which makes false advertising unlawful.

209.    Section 350-a(1) of the New York General Business Law provides that the term 'false advertising' means advertising, including labeling, of a commodity, that is misleading in a material respect. "In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in light of such representations with respect to the commodity. . . ."

210.    Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way, and that constitutes false advertising in violation of Section 350 of the New York General Business Law. Defendant's conduct has constituted multiple separate violations of Section 350 of the New York General Business Law.

211.    In its marketing and advertising, and on the packaging and labeling of the Charcoal Toothpastes Hello made representations that were untrue and materially misleading concerning the Charcoal Toothpastes and also omitted other material information. Hello thereby misrepresents the true benefits, effectiveness, safety and other properties of the Charcoal Toothpastes.

212.    Hello's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Plaintiffs Briley, Fishon, and Patellos and NY Subclass members and other consumers were and continue to be exposed to Defendant's material misrepresentations when purchasing the Charcoal Toothpastes.

213.    Hello's misleading marketing, advertising, packaging and labeling of the Charcoal Toothpastes was likely to deceive a reasonable consumer.

214.    Hello's material and misleading statements include but are not limited to its claims that the Charcoal Toothpastes (i) are safe and gentle enough for everyday use, (ii) are effective for naturally whitening teeth, (iii) de-toxify the mouth, and (iv) have adsorptive properties that freshen breath, lift stains, remove plaque, and provide other benefits. Defendant also omitted material facts, such as that (i) its claims lacked a scientific basis or credible substantiation; (ii) safety had not been evaluated for long-term use, (iii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature and may in fact be detrimental and harmful to oral health and aesthetics.

215.    Plaintiffs Briley, Fishon, and Patellos  and members of the NY Subclass were indeed deceived regarding the characteristics of Hello's Charcoal Toothpastes. Plaintiffs Briley, Fishon, and Patellos  and members of the NY Subclass who purchased the falsely labeled Charcoal Toothpastes were reasonable under the circumstances and could not have known the Charcoal Toothpastes they purchased did not in fact bear the benefits, effectiveness, safety and other properties as advertised, marketed, packaged and labeled.

216.    Defendant's untrue and misleading statements were material to  Plaintiffs Briley, Fishon, and Patellos  and the NY Subclass members, and any reasonable consumer would expect the Charcoal Toothpastes to provide the benefits promised, and to conform to the represented safety and other standards, qualities and properties represented on the products' packaging and labeling and in advertising and marketing, on the Defendant's website, and in other online sales listings.

217.    Any reasonable consumer would also find numerous previously discussed omissions to be highly material, including but not limited to the lack of substantiation, the high abrasivity, the potential detrimental consequences and risk to oral health and aesthetics, and other

nondisclosed information that was material to consumers in the context of Hello's marketing claims.

218.    The misrepresentations in Defendant's advertising and labeling caused the Plaintiffs Briley, Fishon, and Patellos and NY Subclass members to purchase one or more of the Charcoal Toothpastes, and to pay a price premium for such products.

219.    As a result of Defendant's deceptive and false advertising, Plaintiffs Briley, Fishon, and Patellos  and members of the NY Subclass have suffered, and continue to suffer, an injury that they could not have reasonably avoided. They were injured because, had they known the true facts (that the Charcoal Toothpastes did not have the promised benefits, effectiveness, safety and other properties), Plaintiffs Briley, Fishon, and Patellos  and members of the NY Subclass would not have purchased the Charcoal Toothpastes and/or would not have paid the price premium Hello charged for the Charcoal Toothpastes, as compared to similar products that were not falsely advertised and as compared to products sold by Hello itself that did not contain activated charcoal as an ingredient.

220.    As a direct and proximate result of Hello's statutory violations and false advertising, Plaintiffs Briley, Fishon, and Patellos and NY Subclass members have been damaged in the amount of the purchase price of the Charcoal Toothpaste they purchased and/or the price premium paid and are entitled to recover the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

221.    In addition to the consumer injuries alleged herein, Defendant's deceptive and false advertising, marketing and labeling practices have caused harm to competition and the public interest.

222.    Defendant made its untrue and/or misleading statements and representations and omissions willfully, wantonly, and with reckless disregard for the truth.

223.    As a direct and proximate result of Hello's statutory violations and false advertising, Plaintiffs Briley, Fishon, and Patellos and members of the NY Subclass were damaged and are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all monies obtained by Defendant's unlawful conduct, interest, and attorneys' fees and costs.

224.    On behalf of themselves and other members of the NY Subclass, Plaintiffs Briley, Fishon, and Patellos  seek to enjoin Hello from continuing to engage in false advertising and any other unlawful acts and practices, pursuant to New York General Business Law Section 350. Plaintiffs Briley, Fishon, and Patellos  and the members of the NY Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The injuries and harms caused by Defendant's conduct are serious and ongoing.

225.    Pursuant to New York General Business Law Section 350-e, Plaintiffs Briley, Fishon, and Patellos , on behalf of themselves and the members of NY Subclass, seeks to recover the actual damages or $500, whichever is greater, and seeks to have these damages trebled. They also seek any other statutorily available damages and remedies, and to recover reasonable attorneys' fees and costs and further pray for relief as set forth below.

## COUNT FOUR
### *Nationwide Class*
### Intentional Misrepresentation/Fraud

226.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

227.     Plaintiffs bring this Count on behalf of themselves and on behalf of the members of the Class.

228.     Defendant has represented to the public, including Plaintiffs, by promoting, marketing, advertising, packaging, labeling, and other means, that the Charcoal Toothpastes have characteristics and qualities that they do not have. These representations were material, and were uniformly made.

229.     At the time Defendant made the representations alleged herein, Defendant knew the representations were false and/or made them with fraudulent intent.

230.     Defendant made the misrepresentations herein with the intention of depriving Plaintiffs and other Class members of property or otherwise causing injury, and thus, Defendant has committed fraud.

231.     Defendant's deceptive or fraudulent intent may be inferred by allegations and evidence of motive and opportunity, as well as strong circumstantial evidence of conscious misbehavior or recklessness. In the instant case, the allegations previously asserted herein that support scienter include but are not limited: the scientific journals that contradict, refute or call into question Hello's claims, of which it must have been aware (in light of the industry and media reports on the same, as well as consumer complaints); Hello's own clinical studies of its products and/or Hello's intentional selectivity in choosing which products to subject to clinical testing; Hello's selective submission to the ADA Seal Program to omit any charcoal products. Defendant knew that consumers would place trust and confidence in its product claims and rely thereon in their purchase of the products. In addition to Hello's inferred awareness that its claims were unsubstantiated and the products were potentially unsafe, the Defendant expressly represented safety as well as superiority to other products, and also generated great profit by instilling

confidence in its consumer base that its claims were credible; as such, Defendant's motive and opportunity to deceive, and access to accurate information is further strong circumstantial evidence.[149]

232.    Plaintiffs and other Class members believed and relied on Defendant's promoting, marketing, advertising, packaging, and labeling of the Charcoal Toothpastes, and, in justifiable reliance thereon, purchased and used them.

233.    As a proximate result of these acts and omissions, Plaintiffs and Class members were induced to spend money on the Charcoal Products and they were damaged in the economic loss of money spent (in an amount to be determined at trial) on the Charcoal Products that were not as represented, and that were not worth the full value paid, and which Plaintiffs and the Class members would not have purchased, or would have paid less for, but-for the misrepresentations and material omissions.[150]

234.    As a proximate result of these acts and omissions, upon which Plaintiffs and Class members reasonably relied, they also used the Charcoal Toothpastes to their damage, as they were unaware of the risks (including the abrasivity) and lack of substantiation for efficacy, safety as well as adequacy of daily long-term use for dental hygiene and oral health maintenance. The

---

[149]    *See, e.g., Hughes v. Ester C. Co.,* 930 F.Supp.2d 439 (E.D.N.Y. 2013); *Greene v. Gerber Products Co.,* 262 F.Supp.3d 38 (E.D.N.Y. 2017).

[150]    *See, e.g., Weisblum v. Prophase Labs, Inc.,* 88 F.Supp.3d 283, 298 (S.D.N.Y.2015) (concluding that the plaintiffs stated fraud claim based on allegations that the defendants made misrepresentations about cold remedy products, which induced the plaintiffs to buy the products); *Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 472 (E.D.N.Y. 2013) (finding that the plaintiffs stated intentional misrepresentation claim based on allegations that the defendants made a material false representation–that vitamin products protected consumers from illness, that the defendants knew the representation was false, and that the plaintiffs reasonably relied on the representation in purchasing products at a premium, thereby causing damages); *Ackerman v. Coca-Cola, Co.,* 2010 WL 2925955, at *26, 2010 U.S. Dist. LEXIS 73156, at *98–99 (E.D.N.Y. July 21, 2010) (concluding that the plaintiffs stated intentional misrepresentation claim based on allegations that the defendant overstated vitamin water's health benefits and the plaintiffs purchased water at premium price based on the defendant's misrepresentations).

Charcoal Toothpastes contained charcoal, which is known to be abrasive and capable of causing damage to the enamel and gums, and to cause sensitivity and aesthetic issues.

235.    Plaintiffs pray for relief as set forth below.

## COUNTS FIVE THROUGH NINETEEN

236.    Defendant had a statutory duty to refrain from unfair or deceptive acts or practices.

237.    Had Defendant not engaged in wrongful or deceptive conduct, as described above, Plaintiffs and members of the Class would not have purchased and paid for the Charcoal Toothpastes, and/or would not have paid a price premium for them, and they have therefore proximately suffered injury in fact and ascertainable losses.

238.    Defendant's deceptive, unconscionable or fraudulent misrepresentations and material omission to consumers, including the failure to inform of the risks of use and the lack of substantiation, as well as numerous affirmative representations, constituted unfair and deceptive acts and practices in violation of state consumer protection statutes.

239.    Defendant's failure to abide by its statutory duties is ongoing and continues.

240.    Defendant obtained significant sums of money from Plaintiffs and Class members as a result of its wrongful conduct, in which it continues to engage and profit from.

241.    Defendant's actions, as complained of herein, constitutes unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes, including but not limited to the following state consumer protection and deceptive practices statutes as identified below in counts brought by the respective named Plaintiffs on behalf of their respective state subclasses.

242.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the Class members are entitled to a judgment declaring that Defendant's actions have been in

violation of their statutory duties, that provides injunctive relief in order to ensure that ongoing wrongful and similar acts do not continue, and that provides compensatory damages, multiple or or punitive damages, attorneys' fees and costs of suit, and any other damages and remedies provided by statute or to which Plaintiffs and the Class are entitled to or that are otherwise justified by equitable relief, as deemed appropriate by this Court.

### COUNT FIVE
### *AZ Subclass*
### Violations of the Arizona Consumer Fraud Act
### Ariz. Rev. Stat. §§ 44-1522, *et seq.*

243.   Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

244.   Plaintiff Thomas and Plaintiff Cash ("Plaintiffs Thomas and Cash") bring this Count individually on behalf of themselves, and on behalf of the AZ Subclass, and do so pursuant to the Arizona Consumer Fraud Act. Ariz. Rev. Stat. §§ 44-1521, *et seq*. (the "ACFA"), which prohibits "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damage thereby." Ariz. Rev. Stat. § 44-1522(A).

245.   Defendant is a "person" as defined by the ACFA, as are Plaintiffs Thomas and Cash and the members of the AZ Subclass. Ariz. Rev. Stat. § 44-1521(6).

246.   The Charcoal Toothpastes are "merchandise" as defined by the ACFA. Ariz. Rev. Stat. § 44-1521(5).

247.   As previously alleged above herein, Defendant made numerous material statements about the benefits and characteristics of the Charcoal Toothpastes that were false, deceptive or

misleading, in connection with the sale, offers to sell, attempts to sell and advertisements of the Charcoal Toothpastes, and that were intended to be relied upon. These include, but are not limited to, representations that the Charcoal Toothpastes are or can create: (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

248.    Defendant's unlawful conduct also included the omission and suppression of material facts, such as failing to disclose to consumers that (i) its safety and efficacy claims lacked a reasonable factual basis and/or credible and competent scientific substantiation; (ii) safety had not been evaluated for long-term use, (iii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature and may in fact be detrimental and harmful to oral health, dental hygiene, and aesthetics.

249.    Hello knew that its claims were unsubstantiated yet it knowingly failed to disclose to the lack of substantiation to consumers. Hello also knowingly failed to warn consumers of the risk or potential harm from use of the Charcoal Toothpastes.

250.    Defendant's knowing and intentional false promises, misrepresentations, and omissions set forth above constitute unfair and deceptive acts or practices prohibited by the ACFA. Ariz. Rev. Stat. § 44-1522(A).

251.    Defendant's misrepresentations and omissions and other unfair and deceptive acts and practices had the tendency, capacity, and likelihood to deceive and mislead a reasonable consumer acting reasonably in the circumstances. Defendant designed its misrepresentations and omissions in order to deceive and in order to induce their reliance and purchase of the Charcoal Toothpastes. In keeping with its intention, Defendant did, in fact, successfully mislead and deceive reasonable consumers and induce their reliance and purchase to their detriment, including Plaintiffs Thomas and Cash and members of the AZ Subclass.

252.    Hello's deceptive and unfair marketing practices and misleading claims and omissions therein, were uniform to consumers and conveyed a uniformly deceptive and misleading impression of the Charcoal Toothpastes. They were part of a widespread and systematic pattern and/or practice which was designed for its tendency and capacity to mislead.

253.    The safety and efficacy of the Charcoal Toothpastes, and substantiation thereof, were material to Plaintiffs Thomas and Cash and members of the AZ Subclass making their respective purchases. Hello had a duty to accurately disclose the level of substantiation, or lack thereof, for its claims. It also had a duty to make accurate and clear disclosures concerning potential risk or harm from use.

254.    The omission of lack of substantiation and risk of harm were material and intentionally made to induce consumer reliance; they were logically related and rationally significant to Plaintiffs Thomas and Cash and members of the AZ Subclass, in their consideration of the purchase transaction.

255.    In contravention of these and other duties, Hello omitted to make these and other material disclosures, and also made overt claims on safety and efficacy that were misleading and/or

false and did so in order to induce consumer reliance. Defendant's claims on safety and efficacy could be measured and qualified and were not mere puffery.

256.     Plaintiffs Thomas and Cash and members of the AZ Subclass were deceived and misled about the true performance, safety, efficacy, benefits, requisite substantiation, risk, value and other characteristics of the Charcoal Toothpastes. As a direct and proximate result of Defendant's unlawful acts, Plaintiffs Thomas and Cash and members of the AZ Subclass sustained actual damages when they purchased one or more of the misrepresented Charcoal Toothpastes.

257.     The Charcoal Toothpastes did not and cannot deliver promised health or cosmetic benefits, do not have the promised value and are potentially worthless for the intended use, and in fact may be detrimental and pose serious risk.

258.     As a direct and proximate result of Defendant's violations of the ACFA, Defendant caused actual damage to Plaintiffs Thomas and Cash and the AZ Subclass members and they are therefore entitled to damages and other relief as provided under the ACFA. The sustained actual damages are in an amount to be determined at trial and will include the economic injury in the amount of the purchase price(s) of the Charcoal Toothpastes they purchased and/or the price premium paid.

259.     Pursuant to the ACFA, Plaintiffs Thomas and Cash and the AZ Subclass make claims for damages, attorneys' fees and costs.

260.     Plaintiffs Thomas and Cash and members of the AZ Subclass also seek punitive damages as provided under the ACFA. Defendant knew or should have known that its conduct was unfair or deceptive, and/or prohibited by rule. As shown by the allegations herein, Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, thus warranting the imposition of punitive damages under Arizona law.

261.     Plaintiffs Thomas and Cash and members of the AZ Subclass also seek an order for the consumer restitution and for disgorgement of Defendant's ill-gotten gains.

262.     Plaintiffs Thomas and Cash and members of the AZ Subclass assert that Defendant willfully violated Section 44-1522 of the ACFA, because it knew or should have known that its conduct was of the nature prohibited by the ACFA. As such, they seek statutory penalties for willful violations of the ACPA, and for any other just and proper relief available under the ACFA.

263.     Furthermore, if not stopped, Defendant will continue to cause harm to members of the AZ Subclass. Plaintiffs and members of the Classes risk irreparable injury as a result of Defendant's violations of the ACFA, and these violations present a continuing risk to Plaintiffs, the Classes, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest, consumer safety and the competitive market. Pursuant to the ACFA, Plaintiffs and the Classes seek an assurance of discontinuance of the unlawful practices and seek such assurance in the form of a declaratory judgment and court order enjoining the wrongful acts and practices of Defendant, and for any other just and proper relief available under the ACFA.

## COUNT SIX
### *CA Subclass*
### Violation of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200

264.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

265.     Plaintiff Tatum brings this Count individually on behalf of herself and on behalf of the CA Subclass.

266.     Plaintiff Tatum is a person within the meaning of the UCL and she has suffered economic injury as a result of Defendant's unlawful and unfair misconduct, and otherwise meets requirements for statutory standing to sue under the UCL. Cal. Bus. & Prof. Code §§ 17201, 17204.

267.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice" as well as any "unfair, deceptive, untrue or misleading" advertising, and any act prohibited by Sections 17500 through 17577.5. Cal. Bus. & Prof. Code § 17200.

268.    By the acts and conduct alleged herein, Defendant committed unfair, unlawful and/or fraudulent acts and practices and employed deceptive, misleading, and/or untrue advertising, as well as other prohibited acts and practices. Defendant's deceptive acts and practices were likely to deceive or mislead reasonable consumers. Defendant's deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Charcoal Toothpastes. They are likely to mislead, and did mislead, consumers who are reasonable members of the general public acting reasonably under the circumstances, and induced them to purchase the Charcoal Toothpastes.

269.    Defendant's misconduct relating to the Charcoal Toothpastes included misleading and deceptive claims including that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

270.    Defendant also omitted material facts. Defendant's omissions were contrary to the representations it actually made. Additionally, Defendant was under a duty to disclose certain such omissions. Defendant's omissions include that: (i) its safety and efficacy claims lacked a

90

reasonable basis and/or credible and competent scientific substantiation; (ii) the safety for long-term use had not been evaluated; (iii) available scientific literature counter-indicated the safety and effectiveness of charcoal for use in dentifrice; and (iv) the products may in fact be detrimental to cosmetic aesthetics, deficient for dental hygiene, and/or and harmful to tooth enamel and gums and to overall oral health.

**Unlawful**

271.   Defendant violated, and continues to violate, the UCL's prohibition against engaging in unlawful conduct. A business act or practice is "unlawful" under the UCL if it violates established state or federal law. Defendant's conduct falls under the unlawful prong of the UCL, by virtue of the allegations previously asserted herein, and also by virtue of its violations of the following:

a.      The FTC Act and FTC regulations;

b.      The FD&C Act and FDA regulations;

c.      California's Sherman Law (Cal. Health & Safety Code §§ 109875 *et seq.*), as alleged herein, by its act of misbranding and its act of falsely advertising a cosmetic, as well as: the unlawful dissemination of falsely advertised cosmetics (110390), the unlawful manufacture, sale, delivery, holding and offer for sale of a falsely advertised cosmetic (110395), the unlawful advertising of a misbranded cosmetic (110398), the unlawful delivery, proffer for delivery and/or receipt in commerce of a falsely advertised cosmetic (110400);

d.      The CLRA, Cal. Civ. Code §§ 1750, *et seq.*, including §§ 1770(a)(2), (3), (5), (7), and (9), as pled below and as alleged herein; and

e.      Cal. Bus. & Prof. Code §§ 17500, *et seq.*, as pled below and as alleged herein.

**Unfair**

272.    Defendant has also violated, and continues to violate, the UCL's prohibition against engaging in unfair conduct. Defendant has violated the unfair prong of section 17200 of the UCL because the acts and practices alleged herein – including the omission of its lack of substantiation for its claims, and other facts that would detract from its claims, as well as the existence of safety concerns over the use of charcoal in dentifrice – offend established public policy (included but not limited to the policies reflected by the statutory and regulatory provisions cited above), and are immoral, unethical, unscrupulous, as well as substantially injurious to consumers.

273.    Its conduct presents no utility or benefit to consumers or to competition. To the extent any purported benefit is associated with Defendant's acts and practices, any such benefit is greatly outweighed by the gravity of the harm caused to consumers by Defendant's conduct.

274.    Substantial consumer injury could not have reasonably been avoided. Typical and reasonable consumers are not in a position to know and understand the safety concerns posed by the use of charcoal in dentifrice generally or the use of the Charcoal Toothpastes sold by Defendant, or the lack of controlled safety studies for such products.

275.    It also impairs competition within the market for similar dentifrices, and prevents Plaintiff Tatum and the CA Subclass Members from making fully informed decisions about the oral care products to purchase or the price to pay for such products.

**Fraudulent**

276.    Defendant has violated the fraudulent prong of section 17200 of the UCL because its misrepresentation, its omissions, failure to disclose safety concerns and the lack of controlled safety studies were likely to deceive a reasonable consumer, and the true facts would be material to a reasonable consumer.

277.    Had Plaintiff Tatum and the CA Subclass Members been aware of the Defendant's deceptive practices and marketing tactics, and the truth about the misbranded and falsely advertised Charcoal Toothpastes (including the safety concerns; the lack of controlled safety studies; the lack of required substantiation; the misleading and deceptive nature of claims on whitening, detoxifying and other purported properties of the products; and other facts), they would not have purchased the product(s) or would have paid less for the product(s).

278.    Defendant's deceptive and unconscionable conduct is compounded by its continued representation that its Charcoal Toothpastes are safe, as well as its failure to take remedial action.

279.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business and is part of a general practice that is still being perpetuated and repeated throughout the state of California and nationwide. The misbranded products and misleading and deceptive marketing claims continue to be disseminated.

280.    As a direct and proximate result of Defendant's unlawful misconduct, including but not limited to its specific statutory and regulatory violations, Plaintiff Tatum and the CA Subclass Members have been harmed. That harm will continue unless Defendant is enjoined from using the misleading marketing, packaging and labeling described herein in connection with the advertising and sale of its Charcoal Toothpastes.

281.    In accordance with Section 17203 of the UCL, Plaintiff Tatum seeks an order enjoining Defendant from continuing to conduct business through its unlawful, unfair, and deceptive practices, and to commence a corrective advertising campaign.  Cal. Bus. & Prof. Code § 17203. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

282.     Defendant has been unjustly enriched and its monies wrongfully earned should be disgorged, and required to be paid in restitution to Plaintiff Tatum and CA Subclass Members any money that Defendant acquired by unfair competition, as provided under the UCL and/or as otherwise statutorily permitted. Cal. Bus. & Prof. Code § 17204; Cal. Com. Code § 2721.

283.     Plaintiff Tatum and the CA Subclass Members are also entitled to restitution on the basis of quasi-contract or equity, and should be restored with the monies they paid for the falsely advertised misbranded products.

**COUNT SEVEN**
*CA Subclass*
**Violation of California False Advertising Law ("FAL")**
**Cali. Bus. and Prof. Code § 17500 *et seq*.**

284.     Plaintiff Tatum re-asserts and references the allegations in this Third Amended Complaint, and incorporates as if fully set forth herein.

285.     Plaintiff Tatum brings this Count individually, and on behalf of the CA Subclass.

286.     Section 17500 of the California Business and Professions Code, or the FAL, prohibits making false or misleading advertising claims.

287.     The Defendant's acts, conduct, misrepresentations, and non-disclosures of the material facts, as previously alleged herein, constitute false and misleading advertising and therefore are in violation of the FAL and are unlawful.

288.      Defendant's misleading marketing, advertising, packaging and labeling of the Charcoal Toothpastes is false advertising likely to deceive a reasonable consumer. Defendant's marketing, advertising, packaging and labeling of the Charcoal Toothpastes misrepresent the true benefits, effectiveness, safety and other properties of the Charcoal Toothpastes, including but not limited to its claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans

teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb. Plaintiff Tatum and Members of the CA Subclass were indeed deceived regarding the characteristics of the Charcoal Toothpastes. Plaintiff Tatum and Members of the CA Subclass who purchased the falsely labeled Charcoal Toothpastes were reasonable under the circumstances and could not have known the Charcoal Toothpastes they purchased did not in fact bear the properties and qualities as advertised, marketed, packaged, and/or labeled.

289.    Defendant knew, or reasonably should have known, that the claims were untrue or misleading.

290.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiffs and to the Class. Pursuant to Section 17535 of the Business and Professions Code, Plaintiff Tatum seeks an order for the disgorgement of the improperly acquired funds by which Defendant was unjustly enriched. Plaintiff Tatum and the CA Subclass members also seek restitution in the amount they spent on the Charcoal Toothpastes.

291.    Plaintiff Tatum and the CA Subclass Members seek injunctive and equitable relief. Plaintiff Tatum and the CA Subclass members are entitled to injunctive relief, and seek orders to enjoin Defendant from ongoing and future conduct as well as to take corrective action, and orders for any other equitable relief. Defendant's misconduct is ongoing and continuing, such that prospective injunctive relief is necessary.

292.   Plaintiff Tatum is entitled to an award of attorneys' fees and costs in prosecuting this action against Defendant under California's Code of Civil Procedure Section 1021.5 and other applicable law, in part because:

a.   a successful outcome in this action will result in the enforcement of important rights affecting the public interest by maintaining the integrity of representations made concerning the Charcoal Toothpastes;

b.   this action will result in a significant benefit to consumers or a large class of persons by bringing unlawful, unfair and deceptive conduct to a halt, and by causing the return of ill-gotten gains obtained by Defendant;

c.   unless this action is prosecuted, members of a large class of persons will not recover those monies, and many consumers would not be aware that they were victimized by Defendant's wrongful acts and practices;

d.   unless this action is prosecuted, Defendant will continue to mislead consumers about the true nature of its Charcoal Toothpastes;

e.   and an award of attorneys' fees and costs is necessary for the prosecution of this action and will result in a benefit to each member of the Class(es), and consumers in general.

### COUNT EIGHT
### *CO Subclass*
### Violations of the Colorado Consumer Protection Act
### Colo. Rev. Stat. §§ 6-1-101, *et seq.*

293.   Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

294.   Plaintiff Carter brings this Count individually on behalf of himself, and on behalf of the CO Subclass.

295.    Defendant is a "person" within the meaning of the Colorado Consumer Protection Act. Colo. Rev. Stat. § 6-1-102(6).

296.    Defendant engaged in unlawful practices in the course of its business that violated the Colorado Consumer Protection Act including: knowingly making false representations as to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, in violation of Colo. Rev. Stat. § 6-1-105(e); representing that the Charcoal Toothpastes were of a particular standard when Defendant knew or should have known they were of another, in violation of Colo. Rev. Stat. § 6-1-105(g); and failing to disclose material information concerning the Charcoal Toothpastes which information was known at the time of the advertisement and sale and such failure to disclose such information was intended to induce Plaintiff Carter and the CO subclass to enter into a transaction, in violation of Colo. Rev. Stat. § 6-1-105(u).

297.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

298.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and

(ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm. Defendant's conduct significantly impacts the public as actual or potential consumers of the Charcoal Toothpastes.

299.    Defendant knew, or had reason to know, that the foregoing misrepresentations, omissions and other practices were false and/or misleading. Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff and members of the CO Subclass.

300.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Carter and members of the CO Subclass have suffered, and continue to suffer, economic injuries. Plaintiff Carter and members of the CO Subclass purchased one or more of the Charcoal Toothpastes, which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Carter and the CO Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

301.    For violations of the Colorado Consumer Protection Act, and pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Carter, on behalf of himself and the members of the CO Subclass, seeks to recover actual damages sustained; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the Court deems proper.

### COUNT NINE
*FL Subclass*

**Violations of Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. Ann. § 501.201, *et seq.***

302.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

303.     Plaintiff Parks brings this Count individually on behalf of herself, and on behalf of the FL Subclass.

304.     Defendant's acts, omissions, and practices described herein are in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

305.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

306.     The FDUTPA is to be "construed liberally to promote" its stated purposes, including to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection. Fla Stat. § 501.202(3). In construing the FDUTPA, "due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)." Fla. Stat § 501.204(2).

307.     Defendant has engaged in a pattern of business practices that are unfair, deceptive, unconscionable and anti-competitive, and that affected Plaintiff Parks and members of the Florida Subclass, in violation of the FDUTPA. Defendant's conduct also violates other laws, rules and regulations that protect consumers and/or prohibit unfair methods of competition, unfair or deceptive acts or practices, and such violations constitute *per se* violations of the FDUTPA. Fla. Stat § 501.203(3).

308.    Plaintiff Parks is a "consumer" within the meaning of the FDUTPA. Fla. Stat. § 501.203(7).

309.    Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

310.    Defendant's unlawful acts and practices include, but are not limited to, its misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

311.    Defendant also omitted the disclosure of material facts to consumers concerning the Charcoal Toothpastes, including that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature.

312.    Defendant's conduct and practices were likely to deceive a reasonable consumer acting reasonably in the circumstances.

313.    Defendant's misrepresentations and omissions and other practices were intended to induce consumers, including Plaintiff Parks and FL Subclass members, to purchase the Charcoal Toothpastes.

314.   Defendant's conduct constituted unfair and deceptive trade practices in violation of Section 5 of the FTC Act. 15 U.S.C. § 45.

315.   Defendant's conduct violated the FTC Act's prohibition against false or misleading advertisements of food, drugs and cosmetics. 15 U.S.C. § 52.

316.   Defendant's conduct violated the FD&C Act's prohibition on the marketing and movement in interstate commerce of misbranded cosmetics. 21 U.S.C. § 331.

317.   Defendant caused the Charcoal Toothpastes to be misbranded under 21 U.S.C. § 263 and 21 CFR 1.21, and otherwise mislabeled the Charcoal Toothpastes in contravention of federal laws, rules and regulations.

318.   Defendant's conduct violated FTC and FDA rules and regulations requiring that Defendant have a reasonable basis and credible, scientific substantiation for the claims and representations it made concerning the Charcoal Toothpastes in the labeling, packaging, advertisements and marketing of the Charcoal Toothpastes.

319.   Defendant failed to provide a warning to consumers that it lacked adequate substantiation of its claims, and/or to warn of the risk and potential harm from use of its products, in violation of federal rules and regulations including 21 CFR 740.10.

320.   Defendant knew or should have known that its conduct was unfair or deceptive, and/or prohibited by rule.

321.   As a direct and proximate result of Defendant's statutory violations and deceptive, misleading and unfair practices, Plaintiff Parks and the members of the FL Subclass have been aggrieved, injured and suffered damages in the amount of the purchase price(s) of the Charcoal Toothpastes they purchased and/or the price premium paid.

322.    Defendant has engaged in, and continues to engage in, unfair and deceptive practices that offend public policies, and are immoral, unethical, unscrupulous and substantially injurious to consumers. Plaintiff Parks and the FL Subclass risk irreparable injury as a result of Defendant's violations of the FDUTPA, and these violations present a continuing risk to Plaintiff Parks, the FL Subclass, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest, consumer safety and the competitive market.

323.    Pursuant to Fla. State §§ 501.211(2) and 501.2105, Plaintiff Parks and the FL Subclass make claims for damages, attorneys' fees and costs.

324.    Pursuant to Fla. Stat. § 501.211(1), Plaintiff Parks and the FL Subclass seek a declaratory judgment and court order enjoining the wrongful acts and practices of Defendant.

325.    Plaintiff Parks and the FL Subclass also seek an order for the restitution and disgorgement of Defendant's ill-gotten gains, and for statutory penalties of $10,000 *per violation* for Defendant's willful violations of the FDUTPA (Fla. Stat. § 501.2075), and for any other just and proper relief available under the FDUTPA.

## COUNT TEN
### *IL Subclass*
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. 505/1, *et seq.*

326.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

327.    Plaintiff Smith brings this Count individually on behalf of herself, and on behalf of the IL Subclass.

328.    Defendant is a "person" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1(c)).

329.    Defendant engaged in a "sale" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act with regard to the advertisement, offers of sale, sale and distribution of the Charcoal Toothpastes to consumers. (815 ILCS 505/1(d)).

330.    Defendant engaged in unlawful practices and deceptive conduct in the course of its business that violated the Illinois Consumer Fraud and Deceptive Business Practices Act including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of 815 ILCS 505/2.

331.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

332.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific

literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

333.    Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff Smith and members of the IL Subclass.

334.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Smith and members of the IL Subclass have suffered, and continue to suffer, economic injuries. Plaintiff Smith and members of the IL Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Smith and the IL Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

335.    For violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiff Smith, on behalf of herself and the members of the IL Subclass, seek to recover actual damages sustained; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the court deems proper.

## COUNT ELEVEN
### *MA Subclass*
### Unfair and Deceptive Conduct in Violation of M.G.L. c. 93A, § 2

336.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

337.    Plaintiff Durgin brings this claim on behalf of himself and the MA Subclass.

338.   Defendant is a "person" within the meaning of M.G.L. c. 93A, § 1(a).

339.   Defendant engaged in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1(b) with regard to its advertisement, offer for sale, and distribution of the Charcoal Toothpastes to consumers.

340.   Defendant's conduct, as alleged herein, constitutes unfair or deceptive acts or practices and unfair methods of competition in trade or commerce in violation of M.G.L. c. 93A, § 2 and the regulations promulgated thereunder by the Massachusetts Attorney General, including, without limitation, the following:

(a)   940 C.M.R. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

(b)   940 C.M.R.§ 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, ha[ve] the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

(c)   940 C.M.R. §3.05(2) (prohibiting the use of any advertisement "which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale");

(d)   940 C.M.R. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty");

(e)   940 C.M.R. § 3.16(2) (providing that it is a violation of c. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction"); and

(f)   940 C.M.R. § 3.16(3) (providing that an act or practice violates c. 93A, § 2 if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection").

341.    In construing what constitutes unfair or deceptive acts or practices in actions brought under c. 93A, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., § 45(a)(1)), as from time to time amended."  M.G.L., c. 93A, § 2(b).

342.    Defendant engaged in unlawful practices and unfair and deceptive conduct in the course of its business that violated M.G.L., c. 93A, § 2 and the above-reference regulations, including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes; and representing that the Charcoal Toothpastes were of a particular standard when they were of another.

343.    Defendant's unlawful conduct includes its false and misleading statements, representations, and depictions in its marketing and advertising of the Charcoal Toothpastes, including, without limitation, claims that the Charcoal Toothpastes are, will, or can create: (a) naturally whitening; (b) whiten naturally; (c) epic whitening; (d) noticeably whiter teeth; (e) whiten, polish and clean teeth/freshen breath; (e) detoxify your mouth; (f) detoxify and freshen breath; (g) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (h) a detoxifier that removes surface stains and freshens breath; (i) gentle and safe for everyday use; (j) safe for enamel; (k) prevent cavities; (l) adsorptive; (m) adsorb the odors that cause bad breath and the tannins that can stain teeth; (n) help prevent cavities and strengthen enamel; (o) remove plaque; and (p) kick plaque to the curb.

344.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that: (a) its claims lacked a scientific basis or credible substantiation; and (b) the safety and effectiveness of charcoal for use in dentifrices was contra-indicated in scientific literature.

345. Defendant's misrepresentations and omissions were material to consumers (including Plaintiff Durgin and MA Subclass members) in connection with their purchases of the Charcoal Toothpastes, and were made in order to induce consumers' purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices had and have the capacity to mislead consumers, acting reasonably under the circumstances, to act differently than the way they otherwise would have acted (*i.e.,* to entice reasonable consumers to purchase the Charcoal Toothpastes).

346. Such conduct injured Plaintiff Durgin and each of the other MA Subclass members, in that: (a) they paid more for the falsely advertised Charcoal Toothpastes than they would have paid for the Charcoal Toothpastes absent the false and misleading claims; and (b) they paid more for the Charcoal Toothpastes than they would have paid for comparable oral dentifrices that don't make the claims made by Defendant for the Charcoal Toothpastes.

347. The injury suffered by Plaintiff Durgin and MA Subclass members, as described in the preceding paragraph, was incurred as a direct and proximate result of Defendant's unlawful conduct, as alleged herein.

348. Defendant's unfair or deceptive acts and practices, as alleged herein, were willful or knowing violations of M. G. L. c. 93A, § 2, within the meaning of M. G. L. c. 93A, § 9(3).

349. Pursuant to M.G.L. c. 93A, §§ 9(3) and 9(4), Plaintiff Durgin and the other members of the MA Subclass are entitled to recover statutory damages or actual damages, including recovery of double or treble the amount of their actual damages, plus their reasonable attorneys' fees and the costs of this action.

350. Plaintiff Durgin and the other members of the MA Subclass are also entitled to injunctive relief in the form of an order directing Defendant to cease its false and misleading

marketing and advertising, retrieve existing false and misleading labeling, advertising and promotional materials, and publish corrective advertising.

351.    On December 20, 2019, Plaintiff Durgin served Defendant with a written demand for relief pursuant to M.G.L., c. 93A, § 9(3).  Defendant failed to make a reasonable offer of relief in response to Plaintiff Durgin's written demand.

**COUNT TWELVE**
*MA Subclass*
**Untrue and Misleading Advertising in Violation of M.G. L. c. 266, § 91**

352.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

353.    Plaintiff Durgin brings this claim on behalf of himself and the MA Subclass.

354.    Defendant's labeling, advertising, promotion, and marketing of the Charcoal Toothpastes is untrue, deceptive and misleading, in violation of M.G.L. c. 266, § 91.

355.    At all times relevant to this action, Defendant knew, or could, upon reasonable investigation, have ascertained that the labeling, advertising, marketing, and promotion of the Charcoal Toothpastes was untrue, deceptive and misleading.

356.    Defendant's untrue, deceptive and misleading labeling, advertising, marketing and promotion of the Charcoal Toothpastes has continued throughout the Class Period and is continuing as of the present date.

357.    As a purchaser of the Charcoal Toothpastes who was aggrieved by Defendant's untrue and misleading advertising (in that Plaintiff Durgin and the other MA Subclass members purchased a product that did not conform to the claims and representations made about it by Defendant, including claims and representations (as set forth in detail herein) about the Charcoal Toothpastes' superior whitening ability and about the Charcoal Toothpastes' ability to safely

produce the represented results), Plaintiff Durgin is entitled to bring, and brings this class action to seek all available remedies under M.G.L. c. 266, § 91, including injunctive relief.  The injunctive relief would include an order directing Defendant to cease its false and misleading marketing and advertising, retrieve existing false and misleading advertising and promotional materials, and publish corrective advertising.

**COUNT THIRTEEN**
*MI Subclass*
**Violation of the Michigan Consumer Protection Act ("MCPA")**
**Mich. Comp. Laws § 445.901, *et seq.***

358.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

359.    Plaintiff Huston brings this Count individually on behalf of herself, and on behalf of the MI Subclass.

360.    Plaintiff Huston is a person within the meaning of the MCPA and she has suffered economic injury as a result of Defendant's unlawful and unfair misconduct, and otherwise meets requirements for statutory standing to sue under the MCPA. Mich. Comp. Laws §§445.902, 445.903, 445.911.

361.    Representations that goods have "characteristics, ingredients, uses, benefits, or quantities that they do not have," or representations that goods are of a "particular standard, quality, or grade…if they are of another" are specifically prohibited under the MCPA and are constituted as "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]" Mich. Comp. Laws §445.903.

362.    By the acts and conduct alleged herein, Defendant committed unfair, unconscionable and/or deceptive acts and practices and employed deceptive, misleading, and/or untrue advertising, as well as other prohibited acts and practices. Defendant's deceptive acts and

practices were likely to deceive or mislead reasonable consumers. Defendant's deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Charcoal Toothpastes. They are likely to mislead, and did mislead, consumers who are reasonable members of the general public acting reasonably under the circumstances and induced them to purchase the Charcoal Toothpastes.

**Unlawful**

363.    Defendant violated, and continues to violate, the MCPA's prohibition against engaging in unlawful conduct. A business act is unlawful if it violates established state or federal law. According to the MCPA, it is unlawful to engage in "unfair, unconscionable, or deceptive" trade practices as Defendant has done here. Mich. Comp. Laws §445.903.

**Unfair & Unconscionable**

364.    Defendant violated, and continues to violate, the MCPA's prohibition against engaging in unfair and unconscionable conduct. The blatant misrepresentations of the "characteristics, uses, [and] benefits" of the Charcoal Toothpastes made by Defendant is the unfair and unconscionable conduct contemplated by the statute. Mich. Comp. Laws §445.903.

**Deceptive**

365.    Defendant's misrepresentations, omissions, failure to disclose safety concerns and the lack of controlled safety studies are considered deceptive practices under the MCPA because this conduct is likely to deceive a reasonable consumer, and the true facts would be material to a reasonable consumer.

366.    Had Plaintiff Huston and the MI Subclass Members been aware of the Defendant's deceptive practices and marketing tactics, and the truth about the misbranded and falsely advertised Charcoal Toothpastes (including the safety concerns, the lack of controlled safety

studies, the lack of required substantiation, the misleading and deceptive nature of claims on whitening, detoxifying and other purported properties of the products, and other facts), they would not have purchased the product(s) or would have paid less for the product(s).

367.    Defendant's deceptive conduct is compounded by its continued representation that its Charcoal Toothpastes are safe, as well as by its failure to take remedial action.

368.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business and is part of a general practice that is still being perpetuated and repeated throughout the state of Michigan and nationwide. The misbranded products and misleading and deceptive marketing claims continue to be disseminated.

369.    As a direct and proximate result of Defendant's unlawful misconduct, including but not limited to its specific statutory and regulatory violations, Plaintiff Huston and the MI Subclass Members have been harmed. That harm will continue unless Defendant is enjoined from using the misleading marketing, packaging and labeling described herein in connection with the advertising and sale of its Charcoal Tooth Products.

370.    In accordance with Section 445.911 of the MCPA, Plaintiff Huston seeks an order enjoining Defendant from continuing to conduct business through its unlawful, unfair, unconscionable, and deceptive practices, and to commence a corrective advertising campaign. Mich. Comp. Laws §445.911. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

371.    Defendant has been unjustly enriched and its monies wrongfully earned should be disgorged, and Defendant should be required to pay, in restitution to Plaintiff Huston and MI Subclass Members, any money that Defendant acquired by unfair competition, as provided under the MCPA and/or as otherwise statutorily permitted. Mich. Comp. Laws §445.911.

372.     Plaintiff Huston and the MI Subclass Members are also entitled to restitution on the basis of quasi-contract or equity, and should be restored with the monies they paid for the falsely advertised misbranded products.

**COUNT FOURTEEN**
*MO Subclass*
**Violations of the Missouri Merchandising Practices Act ("MMPA")**
**Mo. Rev. Stat. § 407.010, *et seq.***

373.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

374.     Plaintiff Winston brings this Count individually on behalf of herself, and on behalf of the MO Subclass.

375.     Defendant is a "person" within the meaning of the MMPA (Mo. Rev. Stat. §407.010(5)).

376.     Defendant engaged in a "trade" or "commerce" within the meaning of the MMPA with regard to the advertisement, offers of sale, sale and distribution of the Charcoal Toothpastes to consumers. (Mo. Rev. Stat. §407.010(7)).

377.     Plaintiff Winston and members of the MO Subclass purchased Charcoal Toothpastes for personal, family, or household purposes and acted as reasonable consumer in light of all circumstances. (Mo. Rev. Stat. §407.025).

378.     Defendant engaged in unlawful practices and deceptive conduct in the course of its business that violated the MMPA including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of Mo. Rev. Stat. §407.020.1.

379.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

380.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

381.    Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Plaintiff Winston and the MO Subclass have suffered individual damages and have sufficiently definitive and objective evidence to allow their losses to be calculated with a reasonable degree of certainty.

382.    Defendant's deceptive practices misled Plaintiff Winston and members of the MO Subclass and would cause a reasonable person to enter into the transactions that resulted in

damages, and did in fact cause reasonable persons to enter into the transactions, including Plaintiff and members of the MO Subclass.

383.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Winston and members of the MO Subclass have suffered, and continue to suffer, an ascertainable loss of money and economic injuries. Plaintiff Winston and members of the MO Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Winston and the MO Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

384.    For violations of the MMPA, Plaintiff Winston, on behalf of herself and the members of the MO Subclass, seek to recover actual damages sustained; to recover punitive damages; to recover reasonable attorneys' fees and costs; to provide such equity relief as the Court deems necessary or proper to protect Plaintiff Winston and members of the MO Subclass from Defendant's deceptive conduct and any other statutorily available damages or relief the court deems proper.

### COUNT FIFTEEN
### *NJ Subclass*
### Violations of the New Jersey Consumer Fraud Act ("CFA")
### N.J.S.A. § 56:8-1, *et seq.*

385.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

386.    Plaintiff Vain brings this Count individually on behalf of herself, and on behalf of the NJ Subclass.

387.    Defendant is a "person" within the meaning of the CFA (N.J.S.A. § 56:8-1(d)).

388.     Defendant engaged in a "sale" within the meaning of the CFA with regard to the sale, offers of sale, and distribution of the Charcoal Toothpastes to consumers. (N.J.S.A. § 56:8-1(e)).

389.     Defendant engaged in unconscionable commercial practice in the course of its business that violated the CFA including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of N.J.S.A. § 56:8-2.

390.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims, made to Plaintiff Vain and NJ Subclass members on the Charcoal Toothpastes' packaging, its own website and through third-party retailers, that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

391.     Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and

(ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

392.    Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff Vain and members of the NJ Subclass. Defendant's deceptive conduct was contrary to the permissible standard of conduct under the CFA.

393.    Defendant's deceptive practices misled Plaintiff Vain and members of the NJ Subclass and would cause a reasonable person to enter into the transactions that resulted in damages, and did in fact cause reasonable persons to enter into the transactions, including Plaintiff Vain and members of the NJ Subclass.

394.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, as described above, Plaintiff Vain and members of the NJ Subclass have suffered, and continue to suffer, an ascertainable loss and economic injuries. Plaintiff Vain and members of the NJ Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Vain and the NJ Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

395.    For violations of the CFA, Plaintiff Vain, on behalf of herself and the members of the NJ Subclass, seek to recover actual damages sustained or for the Court to award threefold the damages sustained by Plaintiff Vain and members of the NJ Subclass; to recover reasonable

attorneys' fees and costs; and any other statutorily available damages or relief the Court deems proper.

## COUNT SIXTEEN
### *NC Subclass*
**Violations of the North Carolina Unfair and Deceptive Trade Practice Act ("NCUDTPA")**
**N.C. Gen. Stat. § 75-1.1, *et seq.***

396.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

397.     Plaintiff Burns brings this Count individually on behalf of herself, and on behalf of the NC Subclass.

398.     Defendant engaged in "commerce" within the meaning of the NCUDTPA with regard to the sale, offers of sale, distribution, and business activities of the Charcoal Toothpastes to consumers. NCGS §75-1.1(b).

399.     Defendant engaged in unlawful practices in the course of its business that violated the NCUDTPA including: making false representations, knowingly or with reason to know, as to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of NCGS §75-1.1.

400.     Defendant engaged in unlawful practices and deceptive conduct in the course of its business that violated the NCUDTPA including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of NCGS §75-1.1.

401.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

402.     Defendant's unlawful conduct, which affected commerce, also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

403.     Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff Burns and members of the NC Subclass. Defendant's deceptive conduct was contrary to the permissible standard of conduct under the NCUDTPA.

404.     Defendant's deceptive practices misled Plaintiff Burns and members of the NC Subclass and would cause a reasonable person to enter into the transactions that resulted in

damages, and did in fact cause reasonable persons to enter into the transactions, including Plaintiff Burns and members of the NC Subclass. Defendant's misconduct amounted to an inequitable assertion of its power and position.

405.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Burns and members of the NC Subclass have suffered, and continue to suffer, an ascertainable loss and economic injuries. Plaintiff Burns and members of the NC Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Burns and the NC Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

406.    For violations of the NCUDTPA, Plaintiff Burns, on behalf of herself and the members of the NC Subclass, seek to recover actual damages sustained or for the Court to award threefold the damages sustained by Plaintiff Burns and members of the NC Subclass; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the court deems proper.

**COUNT SEVENTEEN**
*SC Subclass*
**Violations of the South Carolina Unfair Trade Practices Act**
**S.C. Code § 39-5-10, *et seq.***

407.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

408.    Plaintiff Aguirre brings this Count individually on behalf of herself, and on behalf of the SC Subclass.

409.    Defendant is a "person" within the meaning of the South Carolina Unfair Trade Practices Act (S.C. Code §39-5-10(a)).

410.    Defendant engaged in "trade" and "commerce" within the meaning of the South Carolina Unfair Trade Practices Act with regard to the sale, offers of sale, and distribution of the Charcoal Toothpastes to consumers. (S.C. Code §39-5-10(b)).

411.    Defendant knowingly engaged in unlawful practices and deceptive conduct in the course of its business that violated the South Carolina Unfair Trade Practices Act including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of S.C. Code §39-5-20(a).

412.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

413.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

414.    Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff Aguirre and members of the SC Subclass.

415.    Defendant's deceptive practices misled Plaintiff Aguirre and members of the SC Subclass and would cause a reasonable person to enter into the transactions that resulted in damages, and did in fact cause reasonable persons to enter into the transactions, including Plaintiff Aguirre and members of the SC Subclass.

416.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Aguirre and members of the SC Subclass have suffered, and continue to suffer, an ascertainable loss and economic injuries. Plaintiff Aguirre and members of the SC Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Aguirre and the SC Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

417.    For violations of the South Carolina Unfair Trade Practices Act, Plaintiff Aguirre, on behalf of herself and the members of the SC Subclass, seek to recover actual damages sustained

or for the Court to award threefold the damages sustained by Plaintiff Aguirre and members of the SC Subclass; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the court deems proper.

**COUNT EIGHTEEN**
*TX Subclass*
**Violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA")**
**Tex. Bus. & Com. Code Ann. § 17.41, *et seq.***

418.    Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

419.    Plaintiff Emerick and Plaintiff Reed ("Plaintiffs Emerick and Reed") brings this Count individually on behalf of themselves, and on behalf of the TX Subclass.

420.    Defendant is a "person" within the meaning of the DTPA (Tex. Bus. & Com. Code Ann. §17.45(3).

421.    Plaintiffs and members of the TX Subclass are "consumers" within the meaning of DTPA (Tex. Bus. & Com. Code Ann. §17.45(4)).

422.    Defendant engaged in "trade" and "commerce" within the meaning of the DTPA with regard to the sale, offers of sale, and distribution of the Charcoal Toothpastes to consumers. (Tex. Bus. & Com. Code Ann. §17.45(6)).

423.    Defendant knowingly engaged in unlawful practices and deceptive conduct in the course of its business that violated the DTPA including: misrepresentations and omissions related to the to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, with the intent that others rely upon the concealment, suppression or omission of such material facts; and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of Tex. Bus. & Com. Code Ann. §17.45(6).

424.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

425.    Pursuant to Tex. Bus. & Com. Code Ann. §17.505, Plaintiffs Emerick and Reed are not required to give notice in order to prevent the expiration of the statute of limitations.

426.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

427.    Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiffs Emerick and Reed and members of the TX Subclass.

428.     Defendant knew, or had reason to know, that the foregoing misrepresentations, omissions and other practices were false and/or misleading. Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiffs Emerick and Reed and members of the TX Subclass.

429.     As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiffs Emerick and Reed and members of the TX Subclass have suffered, and continue to suffer, an ascertainable loss and economic injuries. Plaintiffs Emerick and Reed and members of the TX Subclass purchased one or more of the Charcoal Toothpastes which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiffs Emerick and Reed and the TX Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

430.     For violations of the DTPA, Plaintiffs Emerick and Reed, on behalf of themselves and the members of the TX Subclass, seek to recover actual damages sustained or for the Court to award threefold the damages sustained by Plaintiffs Emerick and Reed and members of the TX Subclass; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the Court deems proper.

## COUNT NINETEEN
### WI Subclass
### Violations of the Wisconsin Deceptive Trade Practices Act
### Wis. Stat. § 100.18, *et seq.*

431.     Plaintiffs re-assert and reference the allegations in this Third Amended Complaint, and incorporate as if fully set forth herein.

432.    Plaintiff Blotnicki brings this Count individually on behalf of himself, and on behalf of the WI Subclass.

433.    Defendant engaged in unlawful practices in the course of its business that violated the Wisconsin Deceptive Trade Practices Act including: making false representations, knowingly or with reason to know, as to the characteristics, ingredients, uses, and benefits of the Charcoal Toothpastes, and representing, knowingly or with reason to know, that the Charcoal Toothpastes were of a particular standard when they were of another, all in violation of Wis. Stat. §100.18(1).

434.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices. These acts and conduct include, but are not limited to, Defendant's misrepresentations and deceptive claims that the Charcoal Toothpastes are or can create (i) naturally whitening; (ii) whitens naturally; (iii) epic whitening; (iv) noticeably whiter teeth; (v) whitens, polishes and cleans teeth/freshens breath; (vi) detoxify your mouth; (vii) detoxifies and freshens breath; (viii) a natural whitener and detoxifier that helps make smiles brighter and breath fresher; (ix) detoxifier that removes surface stains and freshens breath; (x) gentle and safe for everyday use; (xi) safe for enamel; (xii) prevents cavities; (xiii) adsorptive; (xiv) adsorb the odors that cause bad breath and the tannins that can stain teeth; (xv) helps prevent cavities and strengthen enamel; (xvi) removes plaque; and (xvii) kicks plaque to the curb.

435.    Defendant's unlawful conduct also included omitting material facts, such as failing to disclose to consumers that (i) its claims lacked a scientific basis or credible substantiation; and (ii) the safety and effectiveness of charcoal for use in dentifrice was counter-indicated in scientific literature. Defendant failed to warn consumers of the lack of substantiation, and failed to warn consumers of risk or potential harm.

436.    Defendant knew, or had reason to know, that the foregoing misrepresentations, omissions and other practices were false and/or misleading. Defendant's misrepresentations and omission were material to consumers, and made in order to induce consumers' reliance and purchase of the Charcoal Toothpastes (and at a price premium). Defendant's deceptive practices could reasonably be expected to mislead, and did in fact mislead reasonable consumers, including Plaintiff Blotnicki and members of the WI Subclass.

437.    As a direct and proximate cause of Defendant's deceptive practices and unlawful conduct, Plaintiff Blotnicki and members of the WI Subclass have suffered, and continue to suffer, economic injuries. Plaintiff Blotnicki and members of the WI Subclass purchased one or more of the Charcoal Toothpastes, which did not possess the benefits, effectiveness, safety and other qualities that Hello had represented. Had they known the true facts, they would not have purchased the Charcoal Toothpastes, or would have paid less. Plaintiff Blotnicki and the WI Subclass were damaged by the difference in value between the Charcoal Toothpastes as advertised and the Charcoal Toothpastes as actually sold.

438.    For violations of the Wisconsin Deceptive Trade Practices Act, Plaintiff Blotnicki, on behalf of himself and the members of the WI Subclass, seeks to recover damages in twice the amount of pecuniary loss sustained; to recover reasonable attorneys' fees and costs; and any other statutorily available damages or relief the Court deems proper.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated in the Class, and any other created subclasses, prays for relief as follows:

(a)      Certification of this case as a class action, and of the Class as proposed herein (and any other subclasses) under the Federal Rules of Civil Procedure, designation of the Plaintiffs as representatives of the Class, and appointment of the undersigned counsel as counsel for the Class;

(b)      An order enjoining Defendant from making further misrepresentations regarding the Charcoal Toothpastes, including but not limited to statements that the Charcoal Toothpastes:

a.      Whiten teeth;

b.      Detoxify the mouth;

c.      Are safe and gentle for everyday use;

d.      Are safe for enamel;

e.      Are more safe or superior to other dentifrices; and

f.      Have adsorptive or detoxifying properties that provide dental hygiene, oral health, and cosmetic benefits.

(c)      An order requiring Defendant to issue appropriate corrective advertisements and product labeling and packaging, and to retract its prior false and misleading claims and provide required material disclosures;

(d)      Restitution, disgorgement, refund and/or return of all monies, revenues and profits obtained by Defendant by means of misleading, deceptive and unlawful acts or practices;

(e)      Actual damages in an amount to be determined at trial;

(f)      Statutory damages in the maximum amount provided by law;

(g)      Punitive damages;

(h)      Costs, expenses, and reasonable attorneys' fees pursuant to applicable statutes;

(i)      Pre-judgment and post-judgment interest; and

(j) All such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs and the Class hereby demand a jury trial of the claims asserted in this Third Amended Complaint.

Dated: June 15, 2022      Respectfully submitted,

            /s/ *William B. Federman*
            William B. Federman
            (S.D. New York #WF9124)
            Molly E. Brantley, admitted *pro hac vice*
            FEDERMAN & SHERWOOD
            10205 N. Pennsylvania Ave.
            Oklahoma City, Oklahoma 73120
            (405) 235-1560
            (405) 239-2112 (facsimile)
            wbf@federmanlaw.com
            meb@federmanlaw.com

            /s/*David Pastor*
            David Pastor, admitted *pro hac vice*
            Pastor Law Office, LLP
            63 Atlantic Avenue, 3rd Fl.
            Boston, MA 02110
            (617) 724-9700
            Dpastor@pastorlawoffice.com

            *Counsel for Plaintiffs and the*
            *Proposed Classes*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 15, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

        By:  *s/William B. Federman*
          William B. Federman

128